Stephen S. SIMOVITS Jr., Kathleen Simovits and Hope Fair Housing Center, an Illinois Not–For–Profit Corporation, Plaintiffs,

v.

The CHANTICLEER CONDOMINIUM ASSOCIATION, Defendant.

No. 96 C 2385.

United States District Court, N.D. Illinois, Eastern Division.

July 26, 1996.

---

Jeffrey L. Taren, Kinoy, Taren, Geraghty & Potter, Chicago, IL, for Plaintiffs.

Reese J. Peck, Rathje, Woodward, Dyer & Burt, Wheaton, IL, for Defendant.

## *MEMORANDUM OPINION AND ORDER*

KEYS, United States Magistrate Judge.

The complaint herein alleges that Stephen and Kathleen Simovits suffered economic and emotional injuries as a result of the Chanticleer Condominium Association's ("Association") covenant prohibiting residency by children under the age of eighteen. This lawsuit is brought pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., (1995).

## STATEMENT OF FACTS [1]

The Simovits owned a condominium in the Chanticleer Condominium Complex ("Chanticleer"), an eighty-four unit housing facility located in Hinsdale, Illinois. Since 1985, the Association has had a restrictive covenant ("the Covenant") in its Declaration of Condominium Ownership, stating that "no minor children under the age of eighteen (18) years may reside in any unit purchased after the effective date of this amendment", without the prior written approval of the Board of Managers. Residents of Chanticleer who violate the Covenant are subject to injunctive relief and a $10,000 fine. (R. at Ex. 4.) This provision is construed as barring an owner from selling a unit to anyone with children under the age of eighteen.

A large number of Chanticleer's residents are fifty-five years of age or older. However, there is no requirement that residents must be fifty-five years old or older. According to the president of the Association, Jim Londos, Chanticleer is intended for people who are "any age over 18." (R. at 152.) In fact, the last two sales of Chanticleer units have been to people under the age of fifty-five. (R. at 176.)

The Simovits purchased their Chanticleer condominium in June of 1993, for $130,000. Prior to the closing, they appeared before the Association's screening committee. The purpose of this meeting was to explain the Association's rules and regulations, including the Covenant. Mr. Simovits informed the board that he believed the Covenant to be illegal.[2] (R. at 49, 155.) Nonetheless, the Simovits signed a statement acknowledging the rules and agreeing to abide by them.[3]

Shortly after moving into Chanticleer, Mr. Simovits ran for a position on the Associa-

tion's board.[4] During his campaign, he published a newsletter to introduce himself to the residents of Chanticleer. In that newsletter, Mr. Simovits stated that "I like Chanticleer as an adult community and would like to keep it that way." (R. at Ex. 9.) He testified that these comments were politically motivated: "[b]y that time, I knew that many of the residents were elderly and they liked the place as it was. I needed some votes." (R. at 55.) Mr. Simovits lost the election.

While living at Chanticleer, the Simovits made several improvements to their condominium. They remodeled the kitchen with new cabinets and remodeled the bathroom with amenities, such as a Jacuzzi. The Simovits installed a new furnace and central air-conditioning. They also converted the attic into a third bedroom, with air-conditioning. The Simovits expended almost $20,000 in materials on these improvements. (R. at 56–57.)

The Simovits put their Chanticleer condominium on the market in May of 1995, for $187,500.[5] (R. at 48, Ex. 10.) A prospective buyer, represented by real estate agent Karen Jones, expressed an interest in the condominium. However, the Simovits decided not to enter into negotiations with that individual because she had a minor child and they did not wish to cause any problems. (R. at 61.) After several weeks passed without any interested buyers, the Simovits were forced to lower their asking price. They lowered it to $179,500 in July and again, in August, to $169,900. In early November, another prospective buyer, represented by realtor Bonita Swartz, expressed an interest in the Simovits' condominium.[6] According to Ms. Swartz's testimony, the prospect was interested in making an offer on the condomini-

---

1. A bench trial was held on May 23–24, 1996. References are to the transcript pages of those proceedings and the exhibits entered therein.

2. Although Mr. Simovits is primarily employed as a mechanical engineer, he is also a licensed real estate agent.

3. Mr. Simovits testified that his lawyer informed him that, despite his belief regarding the illegality of the Covenant, he had to sign this statement in order to finalize the closing on the condominium. (R. at 50.)

4. The Record is unclear as to the exact position sought by Mr. Simovits.

5. Mr. Simovits testified that he "was planning to come down possibly about $10,000 or so" from this initial asking price. (R. at 58.)

6. Ms. Swartz testified that she could not remember the name of the potential buyer. (R. at 98.)

um. (R. at 98.) At that time, the condominium was on the market for $169,900. The potential buyer had three children, all under the age of eighteen. (R. at 99.)

When Mr. Simovits informed Mr. Londos that he had a potential buyer with minor children, Mr. Londos replied that the Covenant prohibited such a sale. (R. at 156–157.) Mr. Londos also told Ms. Swartz about the Covenant. (R. at 160.) Ms. Swartz testified that, after she told the prospective buyer about the rule, the prospect was no longer interested in making an offer. (R. at 102–103.)

On the same day he informed Mr. Simovits that he could not sell to this prospective buyer, Mr. Londos contacted the Association's lawyer, who called the Simovits on November 8, 1995, warning them that the Covenant prohibited a sale to a person with minor children. (R. at 67, 158.) On November 14, 1995, Mr. Londos received a letter from the Association's lawyer regarding the Simovits and the questionable legality of the Covenant. (R. at 160.) The letter warned Mr. Londos that discriminating against families with children is illegal. (R. at Ex. 31.) The letter stated that the statutory exemptions to the FHA are "strictly construed" and that "[u]nless Chanticleer can produce hard evidence that the community meets these narrowly construed exemptions, the financial liability to Chanticleer could be substantial." (Id.) Mr. Londos shared the contents of this letter with the Association's board members on the day he received it. (R. at 163, Ex. 37.) Despite the warnings in the letter, the Association decided to continue to prevent the Simovits from selling to a buyer with minor children. (R. at 163.)

Immediately after contacting the Association's lawyer in early November, Mr. Londos began to compile a list of all the Chanticleer residents' ages in order to determine the percentage of residents who were fifty-five years of age or older. This was the first time the Association had conducted a survey of this nature. In compiling the survey, Mr.

Londos speculated as to the residents' ages. He testified that he "had a pretty good idea . . . in [his] head who was of what age." (R. at 164.) He did not take any steps to verify these presumptions. Consequently, the list contained inaccuracies.

In preparation for the hearing herein, Mr. Londos conducted another similar survey. In this May 21, 1996 survey, conducted two days prior to the hearing, Mr. Londos used signed affidavits to verify the residents' ages. However, he did not obtain affidavits from all of Chanticleer's residents. He resorted to guessing the ages of those residents who did not submit an affidavit.[7] (R. at 252–255.)

On April 15, 1996, the Simovits entered into a contract to sell their condominium to Brian Weigus and Ramona Caracheo, a couple without children, for $145,000 (R. at Ex. 21). However, the buyers were young, and thus wanted the Covenant waived. (R. at 75.) The Association agreed to waive it, and the deal closed on April 30, 1996. (R. at 177.)

The Simovits allege that, as a result of the Covenant, they lost numerous opportunities to sell their condominium at a higher price. (Complaint for Temporary and Injunctive Relief and Damages [Complaint] ¶ 16.) They enlisted HOPE Fair Housing Center ("HOPE"), a not-for-profit agency dedicated to promoting equal opportunity housing, to challenge the legality of the Covenant.

The Simovits brought suit for the economic damages that they suffered as a result of the Covenant. They allege that the Covenant diminished the value of their condominium by $30,000. Real estate appraiser Robert A. Napoli testified on behalf of Plaintiffs, and appraisers Brent Baldwin and Anthony Uzemack testified on behalf of Defendant. All agreed that the Simovits' condominium was worth $145,000 with the Covenant. (R. at 118, 267, 295.) However, the appraisers disagreed as to the condominium's value without the Covenant. To determine the effect of the Covenant on the value of the condominium, Mr. Napoli looked at recent sales prices

---

7. Mr. Londos' testimony regarding how he determined the ages of those residents who did not submit an affidavit illustrates the speculative nature of these surveys. When asked how he knew

one resident was over the age of fifty-five, Mr. Londos stated that "I have seen her at the meetings. She is definitely over 55." (R. at 256.)

of five condominiums, similar in size and location to the Simovits', that were not subject to a restrictive covenant. He opined that the Simovits' condominium, without the Covenant, was worth $175,000. (R. at 119.) Mr. Uzemack, looking at three of the same properties as Mr. Napoli,[8] opined that the Covenant had no "measurable" effect on the value of the Simovits' condominium—that it was worth $145,000, with or without the Covenant.[9] (R. at 296.)

In addition to diminishing the value of their condominium, the Simovits allege that the Covenant caused them to incur additional mortgage obligations. Because the Covenant delayed the sale of their condominium, the Simovits allege that they paid an extra $3,560.15 in mortgage payments.[10] (Complaint ¶ 17, R. at Ex. 20.) They testified that making these additional mortgage payments caused them financial strain.

Moreover, the Simovits allege that they were emotionally injured as a result of the enforcement of the Covenant. (Complaint ¶ 16.) Mr. Simovits testified to a special sensitivity to discrimination due to events in his past.[11] Mrs. Simovits testified that her husband suffered from chest and stomach pains, as well as sleeplessness, as a result of their inability to sell the condominium.[12] (R. at 195.) Mrs. Simovits testified that she suffered from extreme anxiety, headaches, and abdominal distress due to their inability to sell. (R. at 196.) Mr. and Mrs. Simovits seek $10,000 each in emotional injury damages. (R. at 329.)

HOPE also alleges economic injuries as a result of the Covenant. HOPE is suing for the time and money it devoted to helping the Simovits. HOPE alleges that it diverted its time and resources away from housing counseling in order to help the Simovits pursue this action against the Association. (Complaint ¶ 18.) According to Bernard Kliena, HOPE's executive director, HOPE spent $2,806 in out-of-pocket expenses and $4,424 in staff time on the Simovits' case. (R. at 214, Ex. 45, p. 2.) Additionally, HOPE asks for $35,000 in monitoring and compliance expenses. (R. at 332.)

The Simovits and HOPE both seek punitive damages in the amount of $10,000 from the Association. (R. at 336.) In addition, the Simovits and HOPE seek a 5 year injunction against the Association, requiring them to permit residency at Chanticleer regardless of family status. (R. at 337.)

### DISCUSSION

The following issues are before the Court: (1) whether the Simovits and/or HOPE have standing to sue under the FHA; (2) whether the Association is liable under the FHA for discrimination based on familial status; (3) whether the Association's defenses to liability are viable; and (4) if the Court finds the Association liable and its defenses untenable, what remedies are available to the Simovits and HOPE.

### I. STANDING

#### A. The Simovits' Standing

The Association argues that the Simovits lack standing in this case because they were not the victims of discrimination. The Association claims that, because the Simovits themselves were not denied housing based on their familial status, they are not in the zone of interests protected by the FHA. Howev-

---

8. Mr. Uzemack generally agreed with Mr. Napoli that the properties at 5715 Sutton Place and 498 Old Surrey were comparable to the Simovits' condominium. (R. at 298–300, Ex. 29.) Those properties had recently sold for $157,000 and $140,000, respectively. (Ex. 29, Def's. Ex. 23, p. 7.) Mr. Uzemack testified further that the $157,000 sale price of the Sutton Place property was consistent with the sale prices of comparable Chanticleer units based on his analysis of sales activity in that subdivision. (R. at 299–300.)

9. The Association's other appraiser, Brent Baldwin, agreed with Mr. Uzemack that the value of

the Simovits' condominium, with or without the Covenant, was $145,000.

10. The Simovits allege that they incurred five months of unnecessary mortgage payments on the Chanticleer condominium, at $712.03 per month. (R. at 327, Ex. 20.)

11. Mr. Simovits testified that he "grew up under Nazi occupied Hungary" and that he was "an anti-Communist in Budapest." (R. at 74.)

12. Mr. Simovits did not mention any of these problems during his testimony.

er, in order to have standing to sue under the FHA, the Simovits need not be victims of discrimination. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115, 99 S.Ct. 1601, 1615–1616, 60 L.Ed.2d 66 (1979) (holding that Caucasian residents have standing under FHA to challenge racial discrimination directed against African–Americans in their neighborhood); *United Farm Bureau Mut. Ins. Co. v. Metro. Human Relations Comm'n*, 24 F.3d 1008, 1015 (7th Cir.1994) (rejecting notion that Caucasians are not harmed by discrimination against African–Americans and thus lack standing under the FHA).

■ The sole requirement for standing under the FHA, is the "[Article] III minima of injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1094 (7th Cir.1992), *cert. denied*, 508 U.S. 972, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993). To meet this requirement, the plaintiff must allege that: (1) he or she has suffered a "distinct and palpable" injury; (2) and that the injury is " 'fairly traceable' " to the defendant's discriminatory conduct. *Havens*, 455 U.S. at 376, 102 S.Ct. at 1122–1123.

The Simovits' pleadings satisfy the FHA's permissive standing requirements. First, the Complaint alleges a "distinct and palpable" injury. A showing of the Simovits' financial damage is sufficient to constitute a "distinct and palpable" injury. *See N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 293 (7th Cir.1992), *cert. denied*, 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993) (holding that paying a higher price for home insurance is an economic injury sufficient to meet the standing requirement under the FHA). The Simovits allege that they lost opportunities to sell their condominium at a price higher than the $145,000 obtained through the Weigus deal.[13] Also, the Simovits allege that they suffered financial strain due to the additional mortgage payments they incurred.

Second, the Complaint adequately alleges that the Simovits' injuries are "fairly traceable" to the Association's alleged discrimination. The Complaint alleges that the Association's "no children" rule directly caused the Simovits to lose opportunities to sell their condominium for more than $145,000. The Simovits allege that the prospective buyers were deterred from purchasing the condominium specifically because they had children under the age of eighteen.

The Complaint further alleges that, had the condominium sold earlier to one of these prospective buyers, the Simovits would not have incurred the additional mortgage expenses. The Simovits also claim that their emotional distress was a direct result of this delay in selling. Therefore, because the Simovits' financial and emotional injuries are "fairly traceable" to the Association's alleged misconduct, they have adequate standing to sue in this case.

## B. *HOPE's Standing*

■ The Association alleges that the Simovits are not in the class of people covered by HOPE's mission statement because the Simovits endorsed the Covenant.[14] The Association alleges, therefore, that HOPE lacks standing to sue in this case. However, "the only injury that need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *City of Chicago*, 982 F.2d at 1095 (quoting *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir.1990)). This standard is clearly satisfied here. The executive director of HOPE, Mr. Kliena, testified that the Simovits' case interfered with his work on several fair housing counseling projects. When the Simovits' case commenced, HOPE had a shortage of workers. As a result, Mr. Kliena was forced to direct his time and resources away from the counseling

---

**13.** As stated above, Ms. Jones' client expressed an interest in the condominium, in May of 1995, when the price was $187,500. Also, the prospective buyer obtained through Ms. Swartz expressed an interest when the price was $169,900.

**14.** This allegation refers to Mr. Simovits' newsletter in which he expressed approval for Chanticleer's status as an adult community.

projects to investigate the Simovits' case. Thus, HOPE also has standing to sue.

## II. LIABILITY

■ The question of the Association's liability under the FHA for discrimination based on familial status turns on whether or not Chanticleer meets the exemption for "housing for older persons" in § 3607(b)(2) of the FHA. One category of "housing for older persons" is "housing intended and operated for occupancy by persons 55 years and older." 42 U.S.C. § 3607(b)(2)(C).

Prior to December 28, 1995, the FHA required the following to meet the "55 years and older" exemption: (1) the facility has significant facilities and services specifically designed to meet the physical and social needs of older persons; (2) at least eighty percent of the units are occupied by one person age fifty-five or over; and (3) the complex publishes and adheres to policies which demonstrate an intent to provide housing for persons age fifty-five and older. 42 U.S.C. § 3607(b)(2)(C) (1988).

However, on December 28, 1995, Congress eliminated this "significant facilities and services" requirement. *See* Housing for Older Persons Act of 1995, 42 U.S.C. § 3607(b)(2)(C) (1995). Under the Housing for Older Persons Act of 1995, the following are the requirements to qualify as "age 55 years and older" housing: (1) at least eighty percent of the occupied units are occupied by at least one person who is fifty-five years of age or older; (2) the housing facility publishes and adheres to policies and procedures that demonstrate the intent to provide housing for persons age fifty-five or older; and (3) the housing facility complies with HUD rules and regulations for verification of occupancy.[15] 42 U.S.C. § 3607(b)(2)(C)(i)-(iii). The statute requires that the defendant meet

all of the above requirements to qualify for the exemption. In addition, the defendant has the burden of proving that it meets the above requirements. *See Massaro v. Mainlands Section 1 & 2 Civic Ass'n*, 3 F.3d 1472, 1475 (11th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994).

### A. *Eighty Percent Test*

The Association has failed to provide reliable evidence that, since 1985,[16] eighty percent of the occupied dwellings at Chanticleer have had at least one person fifty-five years of age or older in residence. The Association relies on the results of the two surveys conducted by Mr. Londos to qualify for the exemption. Such reliance, however, is misplaced. Most significant, in the first survey, is the absence of corroborating source documentation. Mr. Londos merely estimated the ages of the Chanticleer residents, neglecting to verify them by using affidavits or other signed statements. A survey compiled in such an unscientific manner does not provide reliable evidence that eighty percent of the occupied dwellings had at least one person age fifty-five or older in residence. Moreover, the circumstances surrounding the taking of this survey—upon the advice of counsel in response to Mr. Simovits' threat to file a lawsuit—makes it clear that, even if the eighty percent requirement were met, it was merely fortuitous and is not indicative of any intent to provide housing for persons age fifty-five or older.

As to the second survey, the corroborating source documentation is incomplete. Mr. Londos did not obtain affidavits from every resident at Chanticleer, and he speculated as to the ages of those residents from whom he did not obtain an affidavit. Consequently, the survey's results are totally unreliable.[17]

---

**15.** The amended statute applies to the case at bar because the Association continued its discriminatory conduct of enforcing the Covenant subsequent to the passage of the new law. Thus, there is no issue of retroactivity in this case.

**16.** The Association's alleged discrimination began in 1985, when the Covenant was added to the Declaration of Condominium Ownership.

**17.** Assuming, *arguendo*, that the Court did rely on Mr. Londos' uncorroborated survey, the sur-

vey fails to support the Association's assertions that exactly eighty percent of Chanticleer's dwellings are occupied by at least one person fifty-five years of age or older. Mr. Londos erred by including the Simovits in this second survey, even though they sold their condominium almost a month before the survey was completed. If the buyers of the Simovits' condominium, Mr. Weigus and Ms. Caracheo, are included in the survey, instead of the Simovits, the percentage of

Accordingly, the Court finds that the Association has failed to meet the eighty percent test.

### B. *Policies and Procedures Test*

The Association freely admits that it does not publish and adhere to policies and procedures that demonstrate an intent to provide housing for persons aged fifty-five years or older.[18]  42 U.S.C. § 3607(b)(2)(C)(ii).  Thus, the Association has, in fact, conceded its liability under the FHA, since qualification for the exemption requires that all three of its requirements be met.  HUD provides a list of six nonexclusive factors for determining whether a facility is in compliance with this test.  These factors are:  (1) the housing facility's written rules and regulations;  (2) the manner which the housing is described to prospective residents;  (3) the nature of advertising;  (4) age verification procedures;  (5) lease provisions;  and (6) the actual practices of the management in enforcing the relevant rules and regulations.[19]  24 C.F.R. § 100.316(b)(1)–(6) (1995) (See 60 Fed.Reg. 43,330 (1995)).

The Association argues, unpersuasively, that these six factors are no longer applicable, in determining whether on not the policies and procedures prong is met, because HUD eliminated § 100.316 on April 25, 1996.  The Federal Register, on which the Association's argument is based, states that "the provisions describing the 'significant facilities and services' requirement for '55 or over' housing in ss100.306, 100.307, 100.310, and 100.316 were deleted to conform to the new requirements of '55 or over' housing established by the Housing for Older Persons Act."  *Regulatory Reinvention; Streamlining of HUD's Regulations Implementing the Fair Housing Act,* 61 Fed.Reg. 18,248 (1996).  Clearly, only the provisions relating to the "significant facilities and services requirement" were deleted.  The provisions in § 100.316 relating to the policies and procedures requirement remain intact.[20]

The finding that these six factors are still applicable under the amended statute is consistent with the legislative history of the Housing For Older Persons Act of 1995.  42 U.S.C. § 3607(b)(2)(C) (1995).  According to the Senate Report, "[t]he purpose of the [December 28, 1995 amendment] was to eliminate the burden of the significant facilities and services requirement."  S.REP. No. 172, 104th Cong., 3d. Sess. 4 (1995) U.S.Code Cong. & Admin.News 778, 780.  Congress deleted this requirement because "nobody, including the Government, can figure out what the phrase 'significant facilities and services' means."  *Id.*  However, nothing in the legislative history suggests that Congress intended the policies and procedures prong to change.  In fact, the statutory language describing the test in the amended statute is exactly the same as it was in the old statute.  Thus, because the policies and procedures prong remains entirely unchanged, so do the criteria for analyzing it.  In the case at bar, neither the Association's written rules and regulations, nor its age verification procedures, demonstrate an intent to provide housing for persons age fifty-five and older.

#### 1. Written Rules and Regulations

█ The Association's written rules and regulations fail to demonstrate an intent to

---

residents at Chanticleer who are fifty-five years or older falls below eighty.

**18.** The Association argues that it is in "effective compliance" with this prong of the statute because Chanticleer has a "longstanding reputation" in the community as a facility for older persons. (R. at 39, 350.) However, the "[e]xemptions from the Fair Housing Act are to be construed narrowly, in recognition of the important goal of preventing housing discrimination." *See Massaro,* 3 F.3d at 1475. The Association's argument for "effective compliance" directly conflicts with this principle of narrow construction.

**19.** Obviously, not all factors are applicable in every case. *See Massaro,* 3 F.3d at 1477–1478. Further, other factors, not included in this list, may be relevant.

**20.** Section 100.316(b) states that "[t]he following factors, *among others,* are relevant in determining whether the owner or manager of a housing facility has complied with the requirements of § 100.316." 24 C.F.R. § 100.316(b) (emphasis added). If this section was deleted in its entirety, as the Association suggests, then no factors at all would be relevant in analyzing a facility's policies and procedures. Clearly, the Association's interpretation of this April 25, 1996 amendment is not what was intended by HUD.

provide housing to persons fifty-five years of age or older. To demonstrate this intent, the Association's rules and regulations must explicitly restrict residency to persons fifty-five years or older. *See Massaro*, 3 F.3d at 1479 (holding that, where a facility's only written rule was a restriction against children, the facility failed to show that it was intended for older persons). There has never been a rule at Chanticleer specifically requiring residents to be fifty-five years of age or older. Indeed, the Association has done nothing to actively pursue prospective residents age fifty-five or over, and all of its sales in 1995 and 1996 were to individuals under the age of fifty-five. (R. at 176.) Rather, the only rule relating to age is the one prohibiting residency by children under eighteen. Therefore, the Association's "no children" policy does not adequately demonstrate an intent to provide housing to persons fifty-five years of age and older.

### 2. Age Verification Procedures

Insofar as the Association has belatedly implemented age verification procedures, the Record does not demonstrate that those procedures are consistent with an intent to maintain the fifty-five year and older exemption. In order to establish the requisite intent, the Association's age verification procedures must be reliable. *Massaro*, 3 F.3d at 1478 (emphasizing that survey is unreliable if not supported by corroborating documentation, such as driver's licenses or birth certificates, that verifies the residents' ages); *HUD v. TEMS*, 2 Fair Housing–Fair Lending (P–H) ¶ 25,028, 25,308 (HUD ALJ 1992) (holding that survey containing several misstatements of the residents' ages is not reliable). For the reasons previously discussed, neither of Mr. Londos' surveys is reliable.

In addition, age verification procedures must be performed on a consistent basis. *See Massaro*, 3 F.3d at 1478. The Association, however, has not consistently verified the ages of the Chanticleer residents. The timing of the events in early November

strongly suggests that Mr. Londos only began compiling his surveys once he was warned, by the Association's lawyer, of a potential legal conflict with the Simovits.[21] *See Massaro*, 3 F.3d at 1478 (minimizing a survey's import in establishing the intent to provide housing for older persons because it was compiled subsequent to the alleged discriminatory actions). Moreover, the Record contains no evidence that the Association ever performed any age verification surveys of the residents prior to those completed by Mr. Londos. The age verification procedures used by the Association, therefore, fall short of demonstrating an intent to provide housing for persons age fifty-five and older.

### C. *Compliance with HUD Rules*

The Association has not complied with the HUD rules for verification of occupancy. The statute requires that the HUD rules: (1) provide for verification by reliable surveys and affidavits; and (2) include examples of the types of policies and procedures relevant to a determination of intent to provide housing for persons fifty-five years and older. 42 U.S.C. § 3607(b)(2)(C)(iii)(I)(II). These requirements for the HUD rules duplicate the requirements under the eighty percent test and the policies and procedures test. As previously discussed, the Association does not meet either of these two prongs. Thus, the Association fails this third statutory prong as well.

In sum, the Court finds that the Association does not qualify for the exemption in § 3607(b)(2)(C) of the FHA. The Association failed all three requirements of the "fifty-five and older" exemption. Therefore, the Association is liable for familial status discrimination that occurred as a result of the Covenant.

### III. DEFENSES

The Association makes the argument that the Simovits should be barred from enforcing their rights under the FHA by the equitable defenses of estoppel,[22] laches, unclean hands,

---

**21.** Mr. Londos first spoke with his lawyer regarding the Simovits on November 7, 1995. That same day, Mr. Londos compiled the first survey of the Chanticleer residents' ages.

**22.** The Association argues that the defense of estoppel also bars HOPE's claim.

and waiver. The Association's arguments for these defenses are discussed *seriatum.*

### A. *Estoppel*

■ The Association claims that the Simovits and HOPE should be estopped from bringing this lawsuit. The Association argues that, in enforcing the Covenant, it detrimentally relied on the Simovits' "purchase of their condominium when at least one of them was fifty-five, their acknowledgement of the covenant, their outright promotion of the covenant, and their retention of the benefits of the covenant." (Defendant's Memorandum of Law in Support of Motion to Dismiss [Def.'s Mem.Supp.] at 20–21.) The Court finds this professed reliance specious, at best, and entirely unpersuasive. The Association was warned, both by the Simovits and by its lawyer, about the illegality of discrimination based on familial status. Consequently, even if the Simovits can be said to have demonstrated "an intent ... to accept the Covenant", the Association should not have enforced it. Clearly, the Association can not escape liability for its enforcement of the Covenant simply because it unreasonably relied on the Simovits' conduct.

■ The Association further argues that "[s]ince none of HOPE's clients or members—other than the Simovits—have been harmed, HOPE's claim should be dismissed." (Def.'s Mem.Supp. at 21.) However, HOPE was not solely protecting the rights of the Simovits in this case. HOPE was also protecting the rights of families with children in DuPage County who are in need of housing. Moreover, as previously discussed, HOPE has the right to sue in this case because it devoted its time and resources to help the Simovits challenge the Association. Therefore, neither the Simovits nor HOPE is estopped from bringing a claim against the Association.

### B. *Laches*

■ The Association argues that the statute of limitations on the Simovits' claim began to toll in 1993, when "the Simovits first learned of the covenant." (Def.'s Mem.Supp. at 22.) According to the Association, the FHA's two year statute of limitations has expired because the Simovits did not file this claim until April of 1996. However, this argument ignores the reasoning in *Havens,* where the Supreme Court held that the limitations period, for claims brought under the FHA, begins on the date of "the last asserted occurrence of [the discriminatory] practice." 455 U.S. at 381, 102 S.Ct. at 1125. In this case, the "last asserted occurrence" of the Association's discriminatory practice was in November of 1995, when it enforced the Covenant against the Simovits. Therefore, the Association's laches argument fails because, under the decision in *Havens,* the Simovits' claim falls within the statutory period.

### C. *Unclean Hands*

■ The Association claims that the Simovits have unclean hands with regard to the Covenant, and thus have no right to challenge its legality. The Association argues that "[w]hen the Simovits moved to Chanticleer, they became part of the association that allegedly promoted and continued the covenant." (Def.'s Mem.Supp. at 22.) Clearly, the Simovits do not have unclean hands merely because they chose to live in a facility that had an illegal covenant in its rules. The Association further argues that the Simovits have unclean hands because "their newsletter promoting the covenant establishes that they were not merely passive participants." (Id.) The Court is unwilling to find that Mrs. Simovits expressed approval of the Covenant, because the newsletter was written by Mr. Simovits. Moreover, the statements made by Mr. Simovits, though suggestive of his approval of the Covenant, fall short of establishing that he has unclean hands. He testified that his endorsement of the "no children" policy was for political reasons. Finally, even if the conduct of the Simovits indicated a clear willingness on their part to accept the benefits of the Association's exclusionary policy until that policy effectively prevented them from selling their unit for its full value, such conduct would not preclude their right to challenge its legality. The Court, therefore, finds that the Association's allegations fail to establish that this cause of action by either Mr. or Mrs. Simovits is barred by the doctrine of unclean hands.

### D. *Waiver*

The Association claims that the Simovits waived their right to bring this lawsuit. The Association alleges that, because Mr. Simovits knew of the FHA's prohibitions against familial status discrimination prior to moving to Chanticleer, "the Simovits abandoned their rights under the Fair Housing Act in order to reside in a community dedicated to others their age." (Def.'s Mem. Supp. at 23.) However, in the Seventh Circuit, "waiver is the intentional relinquishment of a known right." *Larkins v. Nat'l Labor Relations Bd.*, 596 F.2d 240, 247 (7th Cir. 1979); *see also Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1050 (7th Cir.1974) (holding the doctrine of waiver inapplicable where plaintiff lacked the requisite intent to relinquish her rights to sue under a Federal securities statute). In this case, although Mr. Simovits was cognizant of the Covenant's potential illegality, the record contains no evidence that the Simovits intended to relinquish their right to sue under the FHA. Thus, the Court finds that the doctrine of waiver does not bar the Simovits' claim.

### IV. REMEDIES

The FHA provides that, where a defendant has engaged in a discriminatory housing practice, "the court may award to the plaintiff actual and punitive damages ... and as the court deems appropriate ... any permanent or temporary injunction." 42 U.S.C. § 3613(c)(1). The Simovits and HOPE have asked for: (1) an award of damages as compensation for economic losses; (2) an award of punitive damages; and (3) injunctive relief to ensure that the Association will not engage in unlawful housing practices in the future. Additionally, the Simovits have asked for an award of damages as compensation for emotional distress.

### A. *Economic Damages*

The FHA provides that relief may include the actual damages suffered by the plaintiff. 42 U.S.C. § 3613(c)(1). In this case, the Simovits seek $30,000 in damages as compensation for the reduction in the value of their condominium due to the Covenant. The parties agreed that the condominium's value, subject to the Covenant, was $145,000. However, they disagreed as to the condominium's value without the Covenant. Without the Covenant, the Simovits valued the condominium at $175,000. The Association asserts that the Covenant had no effect, and that the condominium was worth $145,000, with or without the Covenant. It sold for $145,000.

While all three experts are professional real estate appraisers, and all valued the Simovits' condominium the same, with the Covenant, their differences of opinion as to whether and to what extent the Covenant has an impact on the value of the property is inexplicable and irreconcilable and can be attributable only to their alignments with the respective parties. The Defendants' experts' opinion that the Covenant has no impact on the value of the units simply defies logic.[23] On the other hand, Plaintiffs' expert's opinion that the Covenant decreases the value of the property by $30,000 appears excessive. The Court discredits Defendant's experts in this regard and credits Plaintiff's expert only to the extent that the Covenant had *some* adverse impact on the value of the property. The Court, then, is left with the necessity of determining a non-arbitrary figure regarding the diminution in value of the property as a result of the Covenant.[24]

In this regard, while Mr. Uzemack disagreed with Mr. Napoli's opinion that the Simovits' property would be worth $175,000 without the Covenant, he agreed that the property located at 5715 Sutton Place, which sold for $157,000, was comparable to their property and that its sale price was consistent with what other units at Chanticleer had sold for in the past. The Court recognizes that the $157,000 figure represents the sale

---

**23.** Mr. Uzemack testified only that the Covenant has no "measurable" impact on the value of the units. (R. at 296.)

**24.** The Court is not persuaded by the fact that, in November, 1995, a prospective buyer showed an interest in the property when it was listed at $169,900, but lost interest when informed that children were not allowed. The Court will not assume that the offer, if any, would have been at the listed price.

of the prior units with the restrictive covenant in place and that logic would dictate that the value without the Covenant would be somewhat higher. However, considering the irreconcilable expert testimony in this regard, any *significant* increase in value in excess of $157,000 would be speculative and arbitrary and is an exercise in which the Court declines to engage. Under these circumstances, the Court finds that the Simovits' condominium, without the Covenant, would have sold for at least $500 more, or $157,500. Therefore, the Simovits are entitled to the difference between the amount at which they sold their property, $145,000, and what they reasonably could have realized but for the Covenant, $157,500. Accordingly, they are awarded $12,500 in damages as compensation for the reduction in value of their condominium.

■ The Simovits also seek recovery for unnecessary mortgage payments made on their Chanticleer condominium. The Covenant created a delay in selling the condominium (by deterring prospective buyers), causing the Simovits to incur $3,560.15 in additional mortgage obligations. This Court finds that, but for the Covenant, the Simovits would not have incurred these costs. Thus, the Simovits are entitled to the $3,560.15 they paid in unnecessary mortgage payments.

■ HOPE seeks recovery of $7,230 in economic losses stemming from the time and resources it devoted to helping the Simovits. The Court awards these damages. The Court, however, declines to award the $35,000 in monitoring and compliance costs sought by HOPE. The goals of monitoring the Association can be achieved through more equitable means, as set forth in the Court's Order below.

### B. *Emotional Distress Damages*

■ Mr. and Mrs. Simovits seek $10,000 each in emotional injury damages. In order for the Simovits to recover for emotional injuries, a causal connection must exist between their alleged injuries and the Association's discriminatory conduct. *Nekolny v. Painter,* 653 F.2d 1164, 1172 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72

L.Ed.2d 139 (1982) (rejecting award for emotional injury damages because mere conclusory statement that plaintiff was "very depressed" failed to establish causal connection between plaintiff's injuries and defendant's discriminatory conduct); *but see Douglas v. Metro Rental Serv., Inc.,* 827 F.2d 252, 257 (7th Cir.1987) (affirming award of $2,500 for emotional distress where the plaintiffs were denied access to an apartment because of their race).

In this case, neither Mr. nor Mrs. Simovits' testimony indicates a causal link between their alleged emotional distress and enforcement of the Covenant. The Court finds that the Association's enforcement of the Covenant did not cause Mr. Simovits any compensable indignity or emotional harm, especially in light of his "feigned" approval of it. Hence, the Simovits suffered, at most, only indirect effects of the "no children" policy; they were not denied housing on the basis of their familial status. The Simovits have cited no authority to support compensation for these indirect emotional injuries. Even if compensation for this indirect emotional distress were available, Mr. Simovits did not provide any testimony of specific injuries he suffered as a result of the Covenant. His only testimony regarding his emotional distress was that he had "very deep rooted emotions about discrimination." (R. at 74.) Clearly, Mr. Simovits' vagueness precludes the Court from finding that enforcement of the Covenant caused him any compensable emotional injury.

Mrs. Simovits, like her husband, was not the direct victim of the Association's discrimination. Therefore, the Court is unable to find a causal connection between her alleged injuries and enforcement of the Covenant. In fact, Mrs. Simovits did not even allege that her emotional distress was caused by the indignity of discrimination against families with children. Rather, she testified that the inability to sell their condominium caused her emotional distress. (R. at 196.) Moreover, although Mrs. Simovits testified to suffering anxiety and headaches, there is no indication that these injuries were atypical of the normal stresses associated with the sale of one's home. Therefore, the Record does

not support an award for emotional damages for either Mr. or Mrs. Simovits.

## C. *Punitive Damages*

■ The Simovits and HOPE seek $10,-000 each (for a total of $20,000) in punitive damages from the Association. Under § 3613(c)(1) of the FHA, the court may award punitive damages to a prevailing party in a housing discrimination case. Generally, punitive damages are awarded in cases where the defendant shows a reckless or callous disregard for the plaintiff's rights. *United States v. Balistrieri,* 981 F.2d 916, 936 (7th Cir.1992) *cert. denied* 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993) (quoting *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637–1638, 75 L.Ed.2d 632 (1983)). The Record in this case contains overwhelming evidence of the Association's reckless disregard for the Simovits' and HOPE's rights. Most significant is the Association's failure to heed the warnings of its lawyer. The November 14, 1995 letter stated that the statutory exemptions to the FHA are "strictly construed" and that "housing discrimination based upon familial status is against federal and state law." Further, it warned the Association of the substantial monetary sanctions it could face in the event it were found in violation. (R. at Ex. 31.) Despite these warnings, the Association persisted in enforcing the Covenant against the Simovits, and prevented them from selling to buyers with children under the age of eighteen. The Minutes of the Association's November 14, 1995 Board of Managers' meeting show that this was a calculated gamble. (R. at Ex. 37.) Moreover, the Association republished its resident directory containing the rules and regulations, including the Covenant, to all residents in March, 1996. (R. at 176, Ex. 32.) This callous and reckless disregard for the Simovits' rights entitles them to punitive damages.

Likewise, the Association showed a reckless disregard for HOPE's rights. The Asso-ciation's continued publication and enforcement of the Covenant, despite warnings of the Covenant's illegality, directly conflicted with HOPE's mission of providing equal housing opportunities to the people of Du-Page County. This reckless disregard for HOPE's rights entitles them to punitive damages.

There is no formula for determining the amount of punitive damages; however, the size of the award should be sufficient to "'punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future.'" *Smith,* 461 U.S. at 54, 103 S.Ct. at 1639 (quoting RESTATEMENT 2d of Torts, § 908(1) (1979)). At the end of 1995, the Association had a cash balance of $44,000.[25] A punitive award of $20,000, approximately one-half of its cash reserves, certainly serves the goals of punishment and deterrence. Moreover, a $20,000 punitive award is not excessive; the Seventh Circuit has affirmed even larger punitive awards in past housing discrimination cases.[26] Thus, a $10,000 award to the Simovits and another $10,000 award to HOPE constitute reasonable punitive awards.

## D. *Injunctive Relief*

■ Section 3613(c)(1) also authorizes the Court to order injunctive relief. Equitable remedies serve the purpose of "eliminating the effects of past discrimination and preventing future discrimination." *Park View Heights Corp. v. City of Black Jack,* 605 F.2d 1033, 1036 (8th Cir.1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1081, 63 L.Ed.2d 321 (1980); *See Balistrieri,* 981 F.2d at 933–934. (Finding of pattern or practice of housing discrimination creates presumption that injunction is appropriate. Defendant may rebut presumption by showing there is little or no danger of current violations.) *See also United States v. City of Parma, Ohio,* 504 F.Supp. 913, 915 (N.D.Ohio 1980), *aff'd,* 661 F.2d 562 (6th Cir.1981), *cert. denied,* 456 U.S.

---

**25.** According to the Association's audited balance sheet as of December 31, 1995, it had $44,180 in its Replacement Fund. The audit report states that this fund is used to accumulate resources for future repairs and replacements. (R. at Ex. 38.)

**26.** In *Phillips v. Hunter Trails Comm. Ass'n,* 685 F.2d 184, 191 (7th Cir.1982), the Seventh Circuit affirmed a punitive award of $100,000 to a married couple.

926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982) (holding that injunction was an appropriate remedy to eliminate effects of defendant's "longstanding" reputation for excluding African–Americans). The testimony herein shows that the Association has no intention of discontinuing the enforcement of the Covenant unless enjoined and that an injunction is necessary to redress its "long-standing reputation ... within th[e] community as a community for older persons." (R. at 39.) The Court is unaware of the pervasiveness of this reputation; however, it is certain that, since the enactment of the Covenant in 1985, families with children have been wrongfully denied the opportunity to live at Chanticleer. Although this type of harm can not be cured by monetary awards alone, the Court has adequate flexibility in fashioning equitable relief to remedy the effects of the Association's discrimination. *See City of Parma*, 504 F.Supp. at 918 (holding that a court has flexibility in shaping its equitable remedies for FHA violations). The remedial plan set forth in the Order below is both reasonable and necessary to redress the Association's discrimination.

### *CONCLUSION*

The Court finds that the Association is liable for discrimination based on familial status under the FHA. Therefore, the Association shall comply with the following:

### *ORDER*

**IT IS HEREBY ORDERED THAT:**

1. By the close of business on September 6, 1996, the Association shall pay the Simovits $26,060.15 in damages. The $26,060.15 consists of:

a. $12,500 for the reduction in value of the Simovits' condominium;

b. $3,560.15 for the additional mortgage payments made on the Chanticleer condominium; and

c. $10,000 in punitive damages.

2. By the close of business on September 6, 1996, the Association shall pay HOPE $17,230 in damages. The $17,230 consists of:

a. $7,230 for HOPE's out-of-pocket expenses and staff time spent on the Simovits' case; and

b. $10,000 in punitive damages.

3. From August 1, 1996 through August 1, 1999, the Association is hereby enjoined from attempting to qualify for any of the "housing for older persons" exemptions provided for in § 3607(b)(2) of the FHA.

4. The Association shall, no later than August 15, 1996, remove from its by-laws, rules, regulations and/or Declaration of Condominium Ownership any policies that discriminate against families with children. Written notification of such action shall be sent to all owners and tenants of units at Chanticleer and to HOPE.

5. By the close of business on the first Friday of January, beginning January 3, 1997, and continuing through January 7, 2000, the Association shall submit annual reports to HOPE containing the following information:

a. A copy of every person's application for the Association's approval to purchase at Chanticleer during the prior year, and a statement indicating the person's name and familial status, whether that person was rejected or accepted, the date on which the person was notified of acceptance or rejection, and, if rejected, the reason for such rejection; and

b. Current occupancy statistics of Chanticleer, indicating the ages of all residents occupying each of the units at Chanticleer.

6. By the close of business on August 26, 1996, the Association shall send written notice, to all real estate brokerage firms listed in the Hinsdale Yellow Pages, consisting of a statement explaining that the Association's discriminatory policies are no longer in effect and that families with children are welcome to reside at Chanticleer. A copy of each letter shall also be sent to HOPE.