**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAYMOND T. BALVAGE and
DEBORAH A. BALVAGE, husband
and wife; CHARLES E. WEAVER and
SUSAN M. WEAVER, husband and
wife; JOYCE MARIE ADAMS; LUVERN
HARLAND ALLEN; EDGAR AMES;
JAMES ALVIN BAKER and DARLA
JEAN BAKER, husband and wife;
RALPH ALVIN BARFELL, JR.; SHARON
MARIE BANTA; RAY BODINE and
JANIE KAY BODINE, husband and
wife; RICHARD ANTHONY BRAGA,
JR. and MARGARET LOUISE BRAGA,
husband and wife; CHARLES
THOMAS CALDWELL and SANDI KAY
CALDWELL, husband and wife;
LAREN WILLBUR COLEMAN and
PAMELA DENISE COLEMAN, husband
and wife; ALVIN DEE COLPITTS and
CORABELLE COLPITTS, husband and
wife; BETTY GENE DONOGHUE;
ELIZABETH ELAINE DUPREE; JOYCE
ELAIN FISCHER; JEANNETTE H.
HEADEN; GLENN RICHARD HUESTIS
and CAROL NADINE HUESTIS,
husband and wife; BARBARA JEAN
JOY; MIRIAM MARGARET KENNEDY-
ALLEN; GERALD BLAIR KOLB and

Nos. 10-35714
10-35970

D.C. No.
3:09-cv-05409-BHS

OPINION

5413

Ethel May Kolb, husband and
wife; Alfred Wesley Leach and
Gloria Eileen Leach, husband
and wife; Raymond Ernest
Morris and Carolyn L. Morris,
husband and wife; Arnold
Nadeau; Karen Campbell; Bob
Pistone and Doris Pistone,
husband and wife; Vern Powell
and Sharon Powell, husband and
wife; Earleen M. Rutherford;
Charles John Santineau;
Barbara Louise Pepper; Lucas
John Shimmin; Don Smith and
Diane Smith, husband and wife;
Donald Neil Stroud and Sharon
Lee Stroud, husband and wife;
Walter Gordon West and Janet
Marie West, husband and wife;
Beverly White; Bob White and
Diane White, husband and wife,
                    *Plaintiffs-Appellees,*

                    v.

Ryderwood Improvement and
Service Association, Inc., a
Washington non-profit corporation,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
January 14, 2011—Seattle, Washington

Filed April 27, 2011

Before: Susan P. Graber and Raymond C. Fisher,
Circuit Judges, and Consuelo B. Marshall, District Judge.*

Opinion by Judge Fisher

---

*The Honorable Consuelo B. Marshall, Senior United States District
Judge for the Central District of California, sitting by designation.

## COUNSEL

Steven Goldstein (argued), Richard Ross and Victoria M. Pond, Betts, Patterson & Mines, P.S., Seattle, Washington, for the defendant-appellant.

Joseph E. Lynam (argued) and Abraham K. Lorber, Lane Powell PC, Seattle, Washington, for the plaintiffs-appellees.

Thomas E. Perez, Assistant Attorney General, Dennis J. Dimsey and Jennifer Levin Eichhorn, Attorneys, U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for amicus curiae Secretary of the U.S. Department of Housing and Urban Development.

## OPINION

FISHER, Circuit Judge:

We hold that a residential community that has continuously operated as a retirement community for persons age 55 or older can qualify for the housing for older persons exemption from the Fair Housing Act's prohibition on familial status discrimination by establishing that it *currently* satisfies the exemption's three statutory and regulatory criteria at the time of the alleged violation, even if the community enforced age restrictions when it first achieved compliance with the exemption's age verification requirement.

### BACKGROUND

### I.

In 1988, Congress amended the Fair Housing Act (FHA) and prohibited housing discrimination on account of familial status. *See* Fair Housing Amendments Act of 1988 (FHAA), Pub. L. No. 100-430, 102 Stat 1619. As amended by the FHAA, the FHA broadly prohibits discrimination against families with children in connection with the sale and rental of housing. *See* 42 U.S.C. §§ 3604(a)-(e), 3605, 3606, 3617, 3631.[1]

---

[1] " 'Familial status' means one or more individuals (who have not attained the age of 18 years) being domiciled with . . . a parent or another

At the same time, Congress recognized the effect these prohibitions would have on retirement communities and created exemptions in the FHA for qualified "housing for older persons." *Id.* § 3607(b). The housing for older persons exemptions permit communities satisfying certain requirements to discriminate on the basis of familial status. *See id.* The exemptions apply to three types of housing, including, as relevant here, housing for persons 55 years of age or older. *See id.* § 3607(b)(2)(C).[2]

The familial status provisions of the FHA, including the housing for older persons exemptions, became effective in March 1989. *See id.* § 3601 note (quoting FHAA § 13(a)). In January 1989, the Department of Housing and Urban Development (HUD) issued final regulations implementing the exemptions. *See* Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3290-3291 (Jan. 23, 1989); *see also* 24 C.F.R. §§ 100.10(b), 100.300-100.304 (1991). A few years later, in 1995, Congress passed the Housing for Older Persons Act (HOPA), Pub. L. No. 104-76, § 2, 109 Stat. 787, which revised the 55 or older exemption.

Under the FHA, as amended by the FHAA and HOPA, housing qualifies for the 55 or older exemption ("the HOPA exemption") when it is "intended and operated for occupancy by persons 55 years of age or older" and three requirements are satisfied:

---

person having legal custody of such individual or individuals; or . . . the designee of such parent or other person having such custody, with the written permission of such parent or other person." 42 U.S.C. § 3602(k). The protections against familial status discrimination also apply to "any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years." *Id.*

[2]Although not relevant here, the exemptions also include (1) housing provided under certain state or federal programs specifically designed and operated to assist elderly persons and (2) housing intended for, and solely occupied by, persons 62 years of age or older. *See* 42 U.S.C. § 3607(b)(2)(A)-(B).

(i) at least 80 percent of the occupied units are occupied by at least one person who is 55 years of age or older;

(ii) the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent required under this subparagraph; and

(iii) the housing facility or community complies with rules issued by the Secretary for verification of occupancy, which shall —

(I) provide for verification by reliable surveys and affidavits; and

(II) include examples of the types of policies and procedures relevant to a determination of compliance with the requirement of clause (ii). Such surveys and affidavits shall be admissible in administrative and judicial proceedings for the purposes of such verification.

42 U.S.C. § 3607(b)(2)(C).[3] It is the third of these criteria — the requirement that the community verify occupancy "by reliable surveys and affidavits" — that is at issue here. In 1999, HUD published final regulations implementing HOPA.

---

[3]Until 1995, when Congress adopted HOPA, a community claiming the 55 or older exemption had to demonstrate "the existence of significant facilities and services specifically designed to meet the physical or social needs of older persons, or if the provision of such facilities and services is not practicable, that such housing is necessary to provide important housing opportunities for older persons." 42 U.S.C. § 3607(b)(2)(C)(i) (1994). HOPA eliminated that requirement and replaced it with the verification requirement now codified at 42 U.S.C. § 3607(b)(2)(C)(iii). *See Taylor v. Rancho Santa Barbara*, 206 F.3d 932, 935 (9th Cir. 2000); Implementation of the Housing for Older Persons Act of 1995, 64 Fed. Reg. 16,324, 16,324 (Apr. 2, 1999).

*See* Implementation of the Housing for Older Persons Act of 1995, 64 Fed. Reg. 16,324, 16,329-16,332 (Apr. 2, 1999); 24 C.F.R. §§ 100.304-100.308. HUD adopted a regulation, 24 C.F.R. § 100.307, specifying the actions a community must take to satisfy the verification requirement mandated by 42 U.S.C. § 3607(b)(2)(C)(iii). Section 100.307 states:

(a) In order for a housing facility or community to qualify as housing for persons 55 years of age or older, it must be able to produce, in response to a complaint filed under this title, verification of compliance with § 100.305 [i.e., at least 80 percent of its occupied units must be occupied by at least one person 55 years of age or older] through reliable surveys and affidavits.

(b) A facility or community shall, within 180 days of the effective date of this rule, develop procedures for routinely determining the occupancy of each unit, including the identification of whether at least one occupant of each unit is 55 years of age or older. Such procedures may be part of a normal leasing or purchasing arrangement.

(c) The procedures described in paragraph (b) of this section must provide for regular updates, through surveys or other means, of the initial information supplied by the occupants of the housing facility or community. Such updates must take place at least once every two years. A survey may include information regarding whether any units are occupied by persons described in paragraphs (e)(1), (e)(3), and (e)(4) of § 100.305.

(d) Any of the following documents are considered reliable documentation of the age of the occupants of the housing facility or community:

(1) Driver's license;

(2) Birth certificate;

(3) Passport;

(4) Immigration card;

(5) Military identification;

(6) Any other state, local, national, or international official documents containing a birth date of comparable reliability; or

(7) A certification in a lease, application, affidavit, or other document signed by any member of the household age 18 or older asserting that at least one person in the unit is 55 years of age or older.

(e) A facility or community shall consider any one of the forms of verification identified above as adequate for verification of age, provided that it contains specific information about current age or date of birth.

(f) The housing facility or community must establish and maintain appropriate policies to require that occupants comply with the age verification procedures required by this section.

(g) If the occupants of a particular dwelling unit refuse to comply with the age verification procedures, the housing facility or community may, if it has sufficient evidence, consider the unit to be occupied by at least one person 55 years of age or older. Such evidence may include:

(1) Government records or documents, such as a local household census;

(2) Prior forms or applications; or

(3) A statement from an individual who has personal knowledge of the age of the occupants. The individual's statement must set forth the basis for such knowledge and be signed under the penalty of perjury.

(h) Surveys and verification procedures which comply with the requirements of this section shall be admissible in administrative and judicial proceedings for the purpose of verifying occupancy.

(i) A summary of occupancy surveys shall be available for inspection upon reasonable notice and request by any person.

24 C.F.R. § 100.307. The regulation requires communities to conduct surveys of residents at least once every two years to verify that at least 80 percent of its occupied units are occupied by at least one person 55 years of age or older. *See id.* § 100.307(a), (c). The surveys must verify the ages of residents by using reliable documents or affidavits. *See id.* § 100.307(d), (e), (g). Summaries of the surveys must be made available to the public upon request. *See id.* § 100.307(i). And the surveys themselves must be maintained and produced in any administrative or judicial proceeding in which the community asserts the 55 or older exemption as a defense to a charge of discrimination. *See id.* § 100.307(a), (h).[4]

---

[4]Only the summary of the surveys must be made available to the public. *See* 24 C.F.R. § 100.307(i); 64 Fed. Reg. at 16,328 ("Only the overall survey summary is required to be available for review, not the supporting documentation."). The individual surveys, affidavits and copies of documentation, on the other hand, should be maintained in community files in

The 1999 regulations also established a one-year transition period, permitting communities that did not satisfy the 80 percent occupancy requirement at the time the regulations were issued to claim the exemption by satisfying the intent and verification requirements, *see* 42 U.S.C. § 3607(b)(2)(C)(ii)-(iii), and reserving unoccupied units for residents 55 and older. *See* 24 C.F.R. § 100.305(e)(5). During the transition period, if a community demonstrated an intent to be housing for persons 55 years or older and complied with the verification requirement, it could reserve unoccupied units for occupancy by at least one person who was 55 years or older and not violate the FHA's prohibitions on discrimination on the basis of familial status. *See id.* The transition period ended on May 3, 2000. *See id.*; 64 Fed. Reg. at 16,324.[5]

The regulations did not address how an existing community could obtain exempt status *after* expiration of the transition period. HUD touched on that issue, however, in a March 2006

the event they must be produced in response to a charge of discrimination. *See* 24 C.F.R. § 100.307(a), (h); 64 Fed. Reg. at 16,327 ("A summary of the information gathered in support of the occupancy verification should be retained for confirmation purposes. Copies of supporting information gathered in support of the occupancy verification may be retained in a separate file with limited access, created for the sole purpose of complying with HOPA, and not in general or resident files that may be widely accessible to employees or other residents. The segregated documents may be considered confidential and not generally available for public inspection. HUD, state or local fair housing enforcement agencies, or the Department of Justice may review this documentation during the course of an investigation.").

[5]If, at the end of the transition period, the community satisfied the 80 percent occupancy requirement and continued to satisfy the other two HOPA criteria, it could continue to operate as an exempt community. If the community could not satisfy the 80 percent threshold at the end of the transition period, it could no longer claim the exemption or discriminate against families with children, but it would not be liable for having reserved unoccupied units for persons 55 or older during the one-year transition period. *See* 64 Fed. Reg. at 16,326.

memorandum from Bryan Greene, HUD's Deputy Assistant Secretary for Enforcement and Programs, to HUD regional directors. Greene's memorandum ("HUD's 2006 policy guidance") explains that communities can obtain exempt status after the transition period by achieving compliance with each of the statutory and regulatory requirements, including the 80 percent occupancy requirement. Beyond the transition period, however, communities can no longer achieve compliance by reserving unoccupied units for older residents or otherwise discriminating on the basis of familial status. The guidance explains:

> [A]n existing community or facility can convert to "housing for older persons" if 80 percent of its occupied units become occupied by at least one person 55 years of age of older. Unlike during the transition period, housing providers cannot discriminate against families with children in order to achieve 80 percent occupancy by persons 55 or older. In other words, a community of facility cannot reserve unoccupied units for persons 55 or older, advertise itself as housing for older persons, or evict families with children in order to reach the 80 percent threshold. If a family with children seeks to occupy a vacant unit in an existing facility before it has met all of the requirements necessary to become housing for older persons, the community or facility must permit the family to live there. Additionally, the facility may not make existing families with children feel unwelcome or otherwise encourage those families to move. While the facility or community may not take any measures deliberately designed to discourage families with children from continuing to reside in the community, nothing prevents the offering of positive incentives that might lead some families to seek housing elsewhere. If the community or facility achieves the 80 percent threshold, without discriminating against families with children, it may then

> publish and adhere to policies and procedures that
> demonstrate an intent to provide housing for persons
> 55 years or older and comply with verification of
> occupancy rules. The facility or community cannot
> publish such policies or procedures in advance of
> meeting the 80 percent threshold (without discrimi-
> nation) as such policies and procedures would have
> a chilling impact upon potential applicants or current
> occupants who are families with children.

Memorandum, Conversion to Housing for Older Persons
Under the Fair Housing Act and the Housing for Older Per-
sons Act of 1995, at 2 (Mar. 6, 2006) (emphasis in original).

## II.

Ryderwood is a residential community located in Cowlitz
County, Washington. It currently consists of approximately
270 single-family homes. It was established in 1953 "as a
community to be occupied by and for the use and benefit of
persons who are bona fide recipients of a pension or retire-
ment annuity." In 1975, the Ryderwood Improvement and
Service Association (RISA), which serves a role comparable
to a homeowners' association for the community's residents,
adopted amended bylaws limiting ownership and residence in
Ryderwood to persons age 55 or older. These 1975 rules state:

> The qualifications for ownership or purchase of a
> home within [Ryderwood] are:
>
> Must be a bona-fide recipient of an annuity or a pen-
> sion.
>
> Must not be less than fifty-five years of age[.]
>
> Must have no additional, permanent occupants of the
> home, (other than the spouse) who do not meet the
> above requirements. (Exceptions to the last require-

ment may be made by the Board of Trustees in the event that health or personal care of either party justifies such permission.)

The plaintiffs are 54 residents of Ryderwood. They filed this action against RISA in July 2009, alleging that the age restrictions imposed by RISA violate the FHA and that RISA has never satisfied the requirements of the HOPA exemption. Second Am. Compl. ¶¶ 72-73.[6] They sought nominal and punitive damages, attorney's fees and costs, declaratory relief and an injunction barring RISA from enforcing rules that discriminate against families with children. *Id.* ¶¶ 75, 81.

The parties filed cross-motions for partial summary judgment. The plaintiffs argued that RISA could not avail itself of the HOPA exemption because it failed to properly "convert" to exempt status. Relying on HUD's 2006 policy guidance, they argued that a community that did not achieve compliance with all of the requirements of the HOPA exemption by the end of the transition period could obtain the benefit of the exemption only by "converting" to exempt status. They argued that a community could permissibly "convert" to exempt status only by achieving compliance with the exemption's requirements without engaging in familial status discrimination. Here, the plaintiffs argued, RISA first attempted to "convert" to exempt status in 2006 or 2007, when it first sought to comply with the verification requirement in 42 U.S.C. § 3607(b)(2)(C)(iii) and 24 C.F.R. § 100.307. They argued that any attempt to convert to exempt status at that time was ineffective because, as RISA admits, RISA was then restricting ownership and residence in Ryderwood to persons age 55 or older. The plaintiffs argued that RISA never properly "converted" to exempt status and thus cannot claim the benefit of the exemption. They contended that, "because

---

[6]Among other things, the plaintiffs claim that they are injured because RISA's age restrictions preclude them from marketing their homes for sale to potential buyers without restriction.

RISA has never successfully converted to HOPA compliance [by achieving compliance without engaging in discrimination], RISA's discriminatory conduct constitutes a violation of the FHA." Pls.' Mot. Partial Summ. J. 13; *see also* Pls' Reply Supp. Mot. Summ. J. 2 ("Plaintiffs assert RISA is not HOPA compliant presently because it wrongfully discriminated against families with children while attempting to convert to HOPA compliance.").

In its opposition to plaintiffs' motion, and its own motion for partial summary judgment, RISA argued that it was permitted to rely on the HOPA exemption so long as it established that it was in compliance with each of the exemption's requirements at the time the alleged discriminatory housing practice occurred, irrespective of whether it first achieved compliance with those requirements without discriminating. RISA contended that "a community is entitled to rely on the exemption if in compliance as of the date of the alleged act of discrimination." Defs.' Opp'n Pl.'s Mot. Partial Summ. J. 18.

RISA also argued that it has satisfied each of the three requirements of the HOPA exemption at all relevant times:

*1.  80 Percent Occupancy.* The FHA requires a community claiming the HOPA exemption to show that "at least 80 percent of the occupied units are occupied by at least one person who is 55 years of age or older." 42 U.S.C. § 3607(b)(2)(C)(i). RISA argued that it has satisfied this requirement through an age verification survey that it completed in September 2007. That survey found that there were 273 available total housing units in Ryderwood, that 25 of those units were either vacant or unverifiable and that 248 housing units were occupied by at least one person age 55 or older. Thus, according to RISA's survey, over 90 percent of the available units were occupied by persons 55 years of age or older on that date.

*2. Policies and Procedures Demonstrating an Intent to Operate as a 55 or Older Community.* The FHA also requires a community to show that "the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent" to operate as a community for persons 55 or older. *Id.* § 3607(b)(2)(C)(ii). RISA argued that it has satisfied this requirement by enforcing age restrictions and posting signs throughout the community stating that residency is limited to those 55 and older.

*3. Verification by Reliable Surveys and Affidavits.* RISA also argued that it has satisfied the requirement for verifying occupancy "by reliable surveys and affidavits." *Id.* § 3607(b)(2)(C)(iii)(I). RISA contended that it completed a survey of all residents in September 2007. The survey entailed "a request for each resident to show they met the 55+ condition by providing a drivers license, birth certificate, passport, and/or a state identification card." Defs.' Mot. Partial Summ. J. 22.

RISA also argued that it satisfied the verification requirement before 2007 because, although no age verification surveys were conducted, it "engaged in less formalized processes that were equally effective." *Id.* RISA presented evidence that it maintained and "regularly updat[ed] an active rolodex that records each residence by address and the current identi[t]ies of each resident." DeBriae Summ. J. Decl. ¶ 18. The rolodex cards include notations of residents' dates of birth. RISA also maintained "a Ryderwood phone book, which lists all residents in Ryderwood." *Id.* ¶ 19.

> In the event that a new resident moves to Ryderwood, this information would be reflected in our annual phone list update, which would then be reflected in RISA's files. If this person was not known to us or not a member, a volunteer from RISA would stop at that home and ask them to join

RISA which, since 1996, has included requiring them to verify their age.

*Id.* In addition, when properties in Ryderwood are sold, RISA asks title companies "to inform the buyers that they need to contact the RISA office and to sign a membership certificate." *Id.* ¶ 20.

The plaintiffs challenged the adequacy of RISA's September 2007 survey in their opposition to RISA's motion for partial summary judgment. They asserted a number of flaws in the survey, arguing that the survey therefore failed to satisfy the FHA's statutory and regulatory requirements.

## III.

The district court granted partial summary judgment to the plaintiffs and denied RISA's motion for partial summary judgment. The court accorded deference to HUD's 2006 policy guidance under *Auer v. Robbins*, 519 U.S. 452, 461 (1997), which holds that judicial deference is owed to an agency's interpretation of its own regulations. The court agreed with the plaintiffs that the guidance bars a defendant from qualifying for the HOPA exemption unless the community first achieved compliance with the exemption's requirements without discriminating against families with children. The court ruled that "[t]he memo is clear that under the regulations, once the transition period ended in May of 2000, any existing community seeking to comply with the HOPA is required to cease discrimination during the period of gaining compliance." Order Granting Mot. Partial Summ. J. June 4, 2010, at 12-13. The court ruled that RISA could not claim the HOPA exemption because it continued to discriminate while attempting to comply with the verification requirements.

In attempting to comply with the HOPA requirements [by completing an age verification survey in 2007], RISA admits that it . . . never ceased discrimi-

nating against persons under the age of fifty-five. Therefore, the Court concludes that RISA is not entitled to summary judgment on its affirmative defense that it is compliant with the HOPA.

*Id.* at 13 (citation omitted). Having rejected RISA's HOPA defense, the court concluded that RISA's rules restricting sales of homes in Ryderwood violated the FHA. The court did not address the plaintiffs' alternative argument that RISA did not qualify for the HOPA exemption because the 2007 survey failed to satisfy the age verification requirements set out in § 3607(b)(2)(C)(iii) and 24 C.F.R. § 100.307. The district court subsequently granted the plaintiffs' motion for a preliminary injunction, ordering RISA to "immediately cease any and all enforcement of age restrictions on the sale, rental, or residency of homes in Ryderwood." Order Granting Prelim. Inj. Mot. Aug. 11, 2010, at 5.

RISA timely appealed the preliminary injunction order. The district court also certified its summary judgment order for interlocutory appeal, and we granted RISA permission to appeal. *See* 28 U.S.C. § 1292(b). We also granted RISA's motion for a stay of the injunction pending appeal and invited the Secretary of HUD to file an amicus brief. We are grateful to the Secretary for having done so.

## STANDARD OF REVIEW

We review de novo a district court's grant or denial of a motion for partial summary judgment. *See Aguilera v. Alaska Juris F/V, O.N. 569276*, 535 F.3d 1007, 1009 (9th Cir. 2008) (denial); *Dare v. California*, 191 F.3d 1167, 1171 (9th Cir. 1999) (grant). We review for an abuse of discretion the district court's grant of a preliminary injunction. *See Nike, Inc. v. McCarthy*, 379 F.3d 576, 580 (9th Cir. 2004).

We defer to HUD's reasonable interpretation of the FHA. *See Meyer v. Holley*, 537 U.S. 280, 287-88 (2003); *Harris v.*

*Itzhaki*, 183 F.3d 1043, 1051-52 (9th Cir. 1999). "[T]he agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force." *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1214 (9th Cir. 2009) (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008) (internal quotation marks omitted)). "[W]e accept the agency's position unless it is 'plainly erroneous or inconsistent with the regulation.' " *Fed. Express Corp.*, 552 U.S. at 397 (quoting *Auer*, 519 U.S. at 461). "Further, an agency's litigation position in an amicus brief is entitled to deference if there is 'no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter.' " *Barrientos*, 583 F.3d at 1214 (quoting *Auer*, 519 U.S. at 462). Finally, HUD's "interpretive policy statements are at least 'entitled to a measure of respect under the less deferential *Skidmore* standard.' " *Id.* (quoting *Fed. Express Corp.*, 552 U.S. at 399). In interpreting the HOPA exemption, we bear in mind that "[e]xemptions from the Fair Housing Act are to be construed narrowly, in recognition of the important goal of preventing housing discrimination." *United States v. City of Hayward*, 36 F.3d 832, 837 (9th Cir. 1994) (quoting *Massaro v. Mainlands Section 1 & 2 Civic Ass'n*, 3 F.3d 1472, 1475 (11th Cir. 1993) (internal quotation marks omitted)).

## Discussion

RISA does not dispute that it engages in conduct that, unless exempt, constitutes unlawful familial status discrimination under the FHA. RISA restricts ownership and residence in Ryderwood to persons who are 55 years of age or older, practices that would violate several provisions of the FHA. *See* 42 U.S.C. § 3604(a)-(d). The sole issue, therefore, is whether RISA is exempt from the FHA's prohibitions on familial status discrimination under one of the housing for older persons exemptions set out in § 3607(b). RISA relies exclusively on the 55 or older exemption ("the HOPA exemption"). *See id.* § 3607(b)(2)(C). As the HOPA exemption is an

affirmative defense, RISA bears the burden of establishing that Ryderwood satisfies each of the HOPA requirements. *See Massaro*, 3 F.3d at 1475; *Gibson v. Cnty. of Riverside*, 181 F. Supp. 2d 1057, 1076 (C.D. Cal. 2002); 64 Fed. Reg. at 16,325. RISA must show that it satisfied the HOPA requirements at the time that the alleged discriminatory housing practice occurred.[7]

The district court concluded that RISA does not qualify for the HOPA exemption with respect to any time between the end of the transition period in May 2000 and the present. We agree in part and disagree in part with that conclusion. The court properly concluded that RISA did not qualify for the HOPA exemption between May 2000 and September 2007, when RISA completed its first HOPA verification survey, because during that time RISA did not verify by reliable surveys and affidavits — or through other adequate means — that at least 80 percent of its occupied units were occupied by at least one person who was 55 years of age or older. *See* 42 U.S.C. § 3607(b)(2)(C)(iii). The court erred, however, when it concluded that RISA was barred from availing itself of the exemption beginning in September 2007, when it completed the initial verification survey, merely because it had failed to "convert" to exempt status without engaging in familial status discrimination.

---

[7]*See* 24 C.F.R. § 100.304(a) (explaining that "[h]ousing qualifies for this exemption if . . . the housing community . . . complied with the HUD regulations in effect *at the time of the alleged violation*" (emphasis added)); 64 Fed. Reg. at 16,331 (explaining that the 80 percent "occupancy requirement must be met *at the time of any alleged violation of the Act*" (emphasis added)); HUD, Questions and Answers Concerning the Final Rule Implementing the Housing for Older Persons Act of 1995, at 13 ("If an individual files a complaint based on familial status and the housing community . . . claims the exemption as a defense, . . . [t]he community . . . has the burden of proving that it was in compliance with HOPA requirements *on the date of occurrence of the alleged act or incident of discrimination*." (emphasis added)).

**I.   Compliance Between May 2000 and September 2007**

**[1]** To qualify for HOPA's affirmative defense, a community must satisfy all three statutory and regulatory requirements. *See Hayward*, 36 F.3d at 837; *see also* 42 U.S.C. § 3607(b); 24 C.F.R. §§ 100.304-100.307.[8] Between May 2000 and September 2007, RISA did not satisfy one of these requirements — the obligation to verify by reliable surveys and affidavits that at least 80 percent of Ryderwood's occupied units were occupied by at least one person who was 55 years of age or older. *See* 42 U.S.C. § 3607(b)(2)(C)(iii); 24 C.F.R. § 100.307.

RISA did not perform verification surveys between 2000 and 2006. With respect to 2000-2004, RISA concedes that it did not conduct surveys. *See* Opening Brief 2 ("RISA does not dispute that in the years 2000-04, it failed to conduct a formal 'HOPA survey' to verify Ryderwood residents' ages, as HOPA regulations provide . . . ."). With respect to 2005-2006, RISA contends that it *did* conduct a survey, but has declined to place evidence of the 2006 survey in the record, instead relying exclusively on the September 2007 survey to establish its compliance with HOPA. We construe RISA's actions as a concession that the 2006 survey does not satisfy HOPA.

RISA nonetheless argues that it satisfied the age verification requirement between 2000 and 2006 because, although it did not conduct adequate verification surveys during that period, it "engaged in less formal verification processes that were equally effective." Opening Br. 28. RISA describes these efforts as follows:

---

[8]In *Hayward*, we applied the pre-HOPA version of the 55 or older exemption. The same principle — that a community must satisfy all three statutory and regulatory requirements to qualify for the exemption — applies equally to the current version of the exemption, as the plain text of the statute and regulations dictate.

> Every home in Ryderwood is subject to the bylaws and deed conditions that require all owners to abide by the 55 and over provision. RISA requires every homeowner to join RISA, and to confirm his or [her] age upon joining. RISA regularly updates its rolodex of all families and its annual neighborhood phone book. This multi-faceted process of verification complemented the covenants and bylaws [that restrict Ryderwood to persons 55 or older].

*Id.*

These verification efforts fall short of the statutory requirements. To satisfy HOPA's verification requirement, a community must verify the age of its residents at least once every two years; the verification must cover all housing units in the community; residents' ages must be verified using reliable documents; a record of the verification, including copies of the relevant documentation, must be maintained in the community's files; and the community must be able to produce that record in response to a complaint of discrimination. *See* 24 C.F.R. § 100.307(a)-(e). Whether considered individually or collectively, the verification efforts described by RISA — the rolodex cards and RISA membership forms — do not satisfy these criteria.

*1. The Rolodex.* RISA apparently maintains a rolodex card for each home in the Ryderwood community. Based on our review of the four sample cards RISA has included in the excerpts of record, we infer that each card contains a list of household residents and information about their dates of birth.

**[2]** These cards do not satisfy HOPA, however. First, they provide *current* information on Ryderwood residents, rather than providing a record of verifications that should have been conducted biennially between 2000 and 2006. RISA cannot rely on current rolodex information to establish that it verified the ages of Ryderwood's residents in 2000, 2002, 2004 or

2006 — especially when no claim has been made that any such verifications actually occurred. Second, although the cards include information about residents' ages, RISA does not contend that this information rests on reliable documentation, such as driver's licenses, birth certificates, passports and signed certifications, as § 100.307(d) requires.

*2. RISA Membership Forms.* RISA also argues that its membership forms satisfy the HOPA verification requirement between 2000 and 2006. RISA explains that it has continuously required Ryderwood homeowners to join its association. To become members, residents are required to complete and sign a membership form. Since 1996, that form has required residents to include information regarding their ages. RISA contends that the existence of these forms is adequate to establish that it verified Ryderwood's compliance with the occupancy requirement at all times between 2000 and 2006.

**[3]** We disagree. Verifications, which must take place at least once every two years, occur at fixed points in time. To satisfy the requirement, a community must do more than collect some data over some period of time. It must collect *complete* data for all residences. The data must be *current* (as of the time of the verification). And the community must *compile* the data: the community must show that it actually used the data to verify that the community in fact satisfied HOPA's 80 percent occupancy requirement at the time of the verification. Here, we have no basis to conclude that the membership forms covered all residences or that they provided current information at any time between 2000 and 2006. *See* Brief of the Secretary of the U.S. Department of Housing and Urban Development as Amicus Curiae ("HUD Br.") 22 ("Requiring new residents to join RISA and purportedly attest to their age does not establish that all members or an occupant of all households have signed this verification, nor has RISA so claimed. . . . Notwithstanding the bylaws' requirement that homeowners be at least 55 years old, RISA membership forms dated from 1990-1992 did not specifically require that

a resident report his or her age."). Furthermore, even if the membership forms contained complete and current information, at no time between 2000 and 2006 did RISA use the information to verify that the occupancy requirement was satisfied. We agree with the HUD Secretary that "[t]he mere possession of various records collected over the years . . . , without more, is inadequate to satisfy the verification obligation. A community must collate information from its files to assess whether, in fact, it has verifiable data of all current occupants and it satisfies the 80% occupancy requirement." *Id.* at 20-21. Here, RISA "has not shown that it has compiled a list of RISA members and compared [the membership] data with occupants for any given year to verify that the 80% occupancy requirement was met." *Id.* at 22. Merely requiring residents to fill out membership forms, "absent any compilation of data, is . . . insufficient to meet the verified survey requirement." *Id.*

**[4]** We accordingly agree with HUD that "RISA's pre-2007 efforts fail to satisfy HOPA's age verification requirements." *Id.* In doing so, we do not disagree with RISA's contention that the HOPA verification requirement may be satisfied by means other than conducting a survey: HUD's regulations provide that a community may verify occupancy "through surveys *or other means.*" 24 C.F.R. § 100.307(c) (emphasis added).[9] The means employed, however, must satisfy the minimum criteria established by the statute and regulations. The efforts undertaken by RISA between 2000 and 2006 do not do so. (Nor were they designed to do so. *See* DeBriae R. 30(b)(6) Dep. 31:3-19, Feb. 12, 2010 (testifying that it was not until spring 2006 that RISA even decided to comply with the HOPA requirements).) The district court thus

[9]Although other means of verification are permissible, a survey of occupants "is the most effective means" of collecting reliable data. HUD Br. 20. "Direct and timely communication with current occupants ensures that a community has verifiable data since the occupants themselves will provide the primary source documentation." *Id.*

properly concluded that RISA does not qualify for the HOPA exemption between 2000 and 2006.

## II.   RISA's Compliance Since 2007

The district court concluded that, even assuming that RISA completed a valid verification survey in September 2007, it cannot qualify for the HOPA exemption because it neither achieved full compliance with HOPA's requirements during the transition period nor properly "converted" to exempt status after the transition period ended by achieving full compliance without discriminating against families with children.

### A.

**[5]** We agree with HUD that the district court erred. The HUD Secretary's amicus brief explains that

> a community like Ryderwood, which has continuously operated as a retirement community for persons age 55 or older, can qualify for the HOPA defense after May 3, 2000 (the end of the regulatory transition period) . . . by establishing that it *currently* satisfies the three statutory and regulatory criteria, even if it did not satisfy HOPA's age verification requirement before the transition ended. Such a community is not barred now or in the future from asserting the HOPA defense, notwithstanding the fact that it may have engaged in familial status discrimination after the transition period and prior to establishing compliance with HOPA's age verification requirement. To the extent the district court held otherwise, its ruling is in error.

HUD Br. 12-13.

**[6]** HUD's position is consistent with the FHA's plain text. Section 3607(b) provides that a community *is* exempt from

the prohibitions on familial status discrimination when the three HOPA requirements *are* satisfied. *See* 42 U.S.C. § 3607(b)(2)(C) (providing that the FHA's familial status prohibitions do not apply to housing when "at least 80 percent of the occupied units *are* occupied by at least one person who is 55 years of age or older," that the "community *publishes* and *adheres* to policies and procedures" demonstrating the intent to operate as a HOPA community and that the "community *complies* with rules issued by [HUD] for verification of occupancy" (emphasis added)). Nothing in the statute suggests that a community's past actions preclude it from qualifying for the exemption based on current compliance.

**[7]** The district court erred by relying on HUD's 2006 policy guidance to reach a different conclusion. The guidance addresses a situation not presented here — "how a community that had not reached the 80% occupancy threshold by the end of the transition period could convert to housing for older persons and take advantage of the HOPA exception." HUD Br. 24.

> It does not address how a community that has consistently maintained the 80% threshold but has failed to comply with HOPA's age-verification requirements can come into compliance with HOPA and take advantage of HOPA's affirmative defense going forward. Nor does the guidance dictate what should happen prospectively if a community maintains the 80% threshold after the end of the transition period by engaging in familial-status discrimination. Thus, to the extent the district court concluded that HUD's 2006 guidance dictated that RISA is not entitled now or in the future to take advantage of the HOPA exception, that reliance was incorrect.
>
> Nothing in HUD's 2006 guidance forbids a housing community that has continuously operated as housing for persons 55 and over from availing itself

> of the HOPA exemption on a prospective basis sim-
> ply because it has previously failed to comply with
> age-verification requirements.

*Id.*

This conclusion does not reward RISA for having disre-
garded the verification requirement, as the plaintiffs contend.
Assuming arguendo that the September 2007 survey satisfies
the verification requirement, RISA became exempt from the
FHA's prohibitions on familial status discrimination at that
time, but RISA cannot claim the exemption for any prior
period. *See Hayward*, 36 F.3d at 837 (housing must meet all
three HOPA requirements to qualify for the exemption);
HUD, Questions and Answers Concerning the Final Rule
Implementing the Housing for Older Persons Act of 1995, at
13 ("If an individual files a complaint based on familial status
and the housing community . . . claims the exemption as a
defense, . . . [t]he community . . . has the burden of proving
that it was in compliance with HOPA requirements *on the
date of occurrence of the alleged act or incident of discrimi-
nation*." (emphasis added)). *Current* compliance with the ver-
ification requirement, in other words, will not shield a
community from liability for discrimination occurring *before*
compliance was achieved. And any person aggrieved by that
pre-compliance discrimination has two years in which to
bring suit. *See* 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved per-
son may commence a civil action in an appropriate United
States district court or State court not later than 2 years after
the occurrence or the termination of an alleged discriminatory
housing practice . . . ."). A community may not, therefore, dis-
regard the verification requirement with impunity.

**B.**

**[8]** The parties dispute whether RISA's September 2007
survey satisfies the statutory and regulatory criteria. The dis-

trict court, which has not yet addressed that issue, should do so on remand.

## CONCLUSION

We affirm in part and vacate in part the district court's grant of partial summary judgment to the plaintiffs. We vacate the preliminary injunction and remand for further proceedings. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART and REMANDED.**