Joseph W. MASSARO, Patricia Ann Massaro, Plaintiffs–Counterclaim Defendants–Appellants,

Joseph P. Massaro, Plaintiff– Counterclaim Defendant,

v.

MAINLANDS SECTION 1 & 2 CIVIC ASSOCIATION, INC., Defendant– Counterclaim Plaintiff–Appellee.

UNITED STATES of America, Plaintiff–Appellant,

v.

MAINLANDS SECTION 1 & 2 CIVIC ASSOCIATION, INC., Defendant– Appellee.

No. 92–4635.

United States Court of Appeals, Eleventh Circuit.

Oct. 7, 1993.

Michael R. Masinter, Ft. Lauderdale, FL, Alan G. Ehrlich, Jacaranda Lakes, FL, Gregory B. Friel, Dennis J. Dimsey, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for appellants.

Kathleen M. Burgener, Alan S. Becker, Becker & Poliakoff, P.A., Ft. Lauderdale, FL, for appellee.

Before KRAVITCH and COX, Circuit Judges and HOBBS *, Senior District Judge.

KRAVITCH, Circuit Judge:

Joint appellants, the United States and the Massaros, filed a complaint against the Mainlands Civic Association (Association) alleging that the Association had discriminated against families with children in violation of the Fair Housing Act Amendments of 1988 by attempting to evict two families with infants. Appellees raise the affirmative defense that the Mainlands community is housing for older persons and thus, qualifies for an exemption under the Act. After a bench trial, the district court found that the Association met all three of the statutory require-

ments for the exemption, 796 F.Supp. 1499. On appeal, the parties have narrowed the issue to one prong of the three-part statutory test of the Fair Housing Act: whether the Mainlands Civic Association has proved "the publication of, and adherence to, policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older." 42 U.S.C. § 3607(b)(2)(C)(iii).[1] The interpretation of this provision presents an issue of first impression in this circuit.

## I.

The Mainlands Section One and Two is a residential community consisting of 529 single-family houses located in Tamarac, Florida. Each home in the Mainlands is owned individually in fee simple, subject to a declaration of restrictions. The declaration of restrictions provides for the formation of the Mainlands Civic Association, a non-profit corporation expressly charged with enforcing the declaration. The declaration also specifies use limitations on the properties, including the age restriction at issue in this appeal, which states that "the use of all the lots in the aforedescribed lands is hereby limited to permanent residents sixteen (16) years of age or older."[2] This provision is the sole age requirement in the declaration. The declaration provides that it cannot be amended before July 1991. Thereafter, the vote of a majority of the homeowners in the subdivision is required for any change in its covenants and restrictions.

On September 26, 1989, the Mainlands Civic Association exercised its authority under the declaration and sent a letter to Joseph and Patricia Massaro advising them that the

---

* Honorable Truman M. Hobbs, Senior U.S. District Judge for the Middle District of Alabama, sitting by designation.

1. For purposes of appeal, appellants have stipulated that the Association satisfies the other two criteria for the exemption by providing significant facilities and services for seniors and meeting the population age requirement. See 42 U.S.C. § 3607(b)(2)(C)(i) and (ii).

2. Declaration of Restrictions, R1–1, Ex. A at 5. The preceding text states that

In recognition of the fact that the subdivisions of THE MAINLANDS OF TAMARAC LAKES

and THE MAINLANDS OF TAMARAC LAKE, SECOND SECTION, have been platted, and the structures to be located therein designed primarily for the comfort, convenience and accommodation of adult persons and in further recognition that the lands and lots comprising same were marketed as an "adults only" neighborhood, the use of all the lots in the aforedescribed lands is hereby limited to permanent residents sixteen (16) years of age or older....

*Id.*

presence of their infant son in their home violated the declaration of restrictions and warning that litigation would ensue if the Massaros refused to remove the child. The Massaros responded by filing a complaint against the Association in federal district court and filing an administrative complaint with the Department of Housing and Urban Development (HUD) alleging that the Association's actions violated the Fair Housing Act's prohibition on discrimination against families with children. The Act provides for judicial and administrative enforcement procedures which may occur simultaneously. 42 U.S.C. § 3604.

Months later, in April of 1990, the Association voted to amend its bylaws to restrict occupancy of the houses in the subdivision to persons 55 years old or over.[3] The Association reserved the right to grant hardship exemptions allowing residents below the age of 55, provided that at least 80% of the lots had one resident 55 years of age or older. The Articles of Incorporation for the Association provides that the bylaws can be amended by "a two-thirds vote of the membership" and membership is open to any homeowner in the Mainlands Section One and Two. The meeting of the Association to amend the bylaws was attended by 166 homeowners and the amendment passed by a vote of 159 in favor of the amendment and 6 against it, with one person abstaining. The meeting also passed a resolution to establish screening procedures to enforce the new amendment.

On September 7, 1990, Carrie and Gary Mirabile received a letter from the Association notifying them that the presence of their infant daughter in their home was a violation of the age prohibition in the declaration of restriction because she was under the age of sixteen. The Mirabiles also filed a complaint with HUD.

As a result of the complaints of the Massaros and the Mirabiles, HUD sent an investigator to the Mainlands. HUD's regional counsel subsequently determined that there was reasonable cause to believe that bias had occurred and issued a charge of discrimination. The agency made several findings to support its conclusions. The report stated that "[p]rior to April 13, 1990, the Association had not published policies and procedures demonstrating an intent to make Mainlands 'housing for persons 55 years of age or older.' "[4] Moreover, the agency found that the Association had failed to adhere to the policies stated in the amendment to the bylaws and that the Association maintained inadequate procedures to verify the ages of persons owning homes in the subdivision. HUD concluded that the Association failed to meet its burden of demonstrating that it qualifies for the exemption; accordingly, its actions against the Massaros and Mirabiles constituted discrimination on the basis of familial status.

After HUD issued a final determination, the case was referred to the Justice Department, which filed a complaint in federal district court on behalf of the United States. The district court consolidated the Massaros' and the United States's cases and conducted a bench trial. Contrary to HUD, the district court found that the Association met the requirements of the statute, thus qualifying for the exemption and defeating the discrimination charge. The Massaros and the United States appeal this decision.

 A district court's findings of fact are reviewed under a clearly erroneous standard. Fed.R.Civ.P. 52(a). The application of the law to the facts, however, is subject to de novo review. *See Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc.*, 990 F.2d 598, 601 (11th Cir.1993). Furthermore, under the law of this circuit, the Association carries the burden of proving its eligibility for the exemption. *Rogers v. Windmill Pointe Village Club Ass'n, Inc.*, 967 F.2d 525, 527 (11th Cir.1992). Exemptions from the Fair Housing Act are to be construed narrowly, in recognition of the important goal of preventing housing discrimination. *Elliott v.*

---

**3.** The amendment provides in pertinent part that "[n]o lot shall, at any time, be permanently occupied by children who are under eighteen (18) years of age.... No permanent occupancy of any lot shall be permitted by an individual be-

tween the ages of eighteen (18) and fifty-five (55)."

**4.** Determination of Reasonable Cause and Charge of Discrimination, R4–143 at 5.

*City of Athens,* 960 F.2d 975, 979 (11th Cir. 1992).

## II.

Congress amended the Fair Housing Act in 1988 to include a prohibition against housing discrimination based on familial status. 42 U.S.C. § 3604. The Act defines the term "familial status" as "one or more individuals (who have not attained the age of 18 years)" living with a parent or legal guardian. 42 U.S.C. § 3602(k). Members of Congress determined the need for such legislation based on studies and hearings indicating that families with children were having difficulty securing housing because of age limitations. *See* 134 Cong.Rec. S10547 (daily ed. Aug. 2, 1988) (statement of Sen. Hatch); *see also Seniors Civil Liberties Ass'n, Inc. v. Kemp,* 965 F.2d 1030, 1035 (11th Cir.1992).[5]

Some members, however, expressed misgivings regarding the impact of the amendments on retirement communities, where elderly residents had bought or rented homes with the expectation that they would be able to live without the noise and hazards of children. *See* 134 Cong.Rec. H6499 (daily ed. Aug. 8, 1988) (statement of Rep. Fish). To address these concerns, the Act exempts "housing for older persons" from the familial status provisions in the Act. Older persons' housing is defined as that "intended for occupancy by at least one person 55 years of age or older per unit." 42 U.S.C. § 3607(b)(2)(C). Congress gave the Department of Housing and Urban Development the authority to determine whether housing qualifies for the exemption. The Act further provides that,

> the Secretary [of HUD] shall develop regulations which require at least the following factors:
>
> (i) the existence of significant facilities and services specifically designed to meet the physical or social needs of older persons. . . .
>
> (ii) that at least 80 percent of the units are occupied by at least one person 55 years of age or older per unit; and
>
> (iii) the publication of, and adherence to, policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older.

*Id.*

In accordance with the statute, the Secretary of HUD promulgated regulations providing for the minimal requirements listed in the Act and further clarifying them. The pertinent regulations for this case explicate the third part of the statutory test requiring the publication of, and adherence to procedures and policies indicating an intent to provide housing for older persons. According to 24 C.F.R. § 100.304(c)(2), there are six non-exclusive factors which are relevant to a determination under this part of the test:

> (i) The manner in which the housing facility is described to prospective residents.
>
> (ii) The nature of any advertising designed to attract prospective residents.
>
> (iii) Age verification procedures.
>
> (iv) Lease provisions.
>
> (v) Written rules and regulations.
>
> (vi) Actual practices of the owner or manager in enforcing relevant lease provisions and relevant rules or regulations.

*Id.* These six determinants, along with the statute, are the primary criteria guiding HUD and the courts in their assessment of whether a defendant has violated the Fair Housing Act. *See Park Place Home Brokers v. P-K Mobile Home Park,* 773 F.Supp. 46, 48–51 (N.D.Ohio 1991) (analyzing statute and regulations to determine whether mobile-home park had significant facilities and services for older persons).[6]

---

**5.** In *Seniors,* this court upheld the statutory provisions against numerous challenges, including charges that the statute violates the First Amendment's guarantee of freedom of association; violates the Fifth Amendment by depriving persons of their liberty and property interest; deprives persons of their right to privacy; violates the Tenth Amendment by encroaching on state's rights; and is unconstitutionally vague. 965

F.2d at 1033. This court found each of these claims meritless and noted the "strong deference accorded to legislation in the field of national economic policy." *Id.* at 1035.

**6.** Fair housing discrimination cases are subject to the three-part test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Secretary, HUD on*

### III.

Before analyzing the six regulatory factors, the district court noted a preliminary concern as to whether the Association was an organizational entity which could claim the exemption. Both the statutory and regulatory language of the exemption focus on the actions and intent of the owner or manager of the housing complex.[7] The Mainlands subdivision, however, does not have a centralized owner or manager. The record in this case establishes that the Mainlands Civic Association does not own any of the homes in the subdivision, nor does it lease or rent the dwellings. It participates in no aspect of the selling, buying, renting or leasing process for any of the houses. Furthermore, the Association produces no advertising material to publicize vacancies or attract future residents.

Although the Association is not an owner or manager, we agree with the district court that it is eligible for the exemption. First, the Association performs the functions of an owner and manager in several critical ways relevant to the purpose of the Fair Housing Act. The Association has the power to enforce the declaration of restrictions and thus, to exclude persons from occupancy in the homes. The Association also regulates the use of the homes through its bylaws and by amending the declaration of restrictions. Whenever possible, courts construe statutory language to be true to the meaning of the legislation. As Judge Learned Hand stated, statutes "should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them." *Lehigh Valley Coal Co. v. Yensavage*, 218 F. 547, 553 (2nd Cir.1914), *cert. denied*, 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434 (1915), *quoted in Connecticut Nat. Bank v. Germain*, —— U.S. ——, —— n. 1, 112 S.Ct. 1146, 1150 n. 1, 117 L.Ed.2d 391 (1992) (Stevens, J., concurring). In this case, the Association acts as an owner in performing functions which are relevant to the goals of the Act.

Second, Congress intended to rid the entire housing market of discrimination and homeowners' associations are not expressly omitted from the reach of the Act. Congress did create a limited exemption for "any single-family house sold or rented by an owner." 42 U.S.C. § 3603. The exemption is crafted narrowly and the owner is prohibited from using any rental services of a broker or agent, or advertising, posting or publicizing an intent to discriminate. In the instant case, the single-family homeowners chose to buy homes covered by a declaration of restrictions which created an Association empowered with enforcement of the declaration. The declaration and the Association's powers distinguish this case from that of a single family homeowner and place the Association within the reach of the Act. Moreover, the record shows that the Association conducted a mailing to notify real estate brokers that the subdivision claims an exemption from the Act and excludes children. Thus, the Association has performed functions of an owner and manager and is not expressly exempt from the Act's provisions.

Finally, this circuit previously has considered a homeowner association's eligibility for the older persons' exemption to the Fair Housing Act. *Rogers*, 967 F.2d 525. Although the court did not expressly find that such an entity was eligible for the exemption, the court considered whether the association's actions met the statutory and regulatory requirements. Thus, the actions of this type of an organization can be subject to judicial scrutiny under the Act. Accordingly, we analyze the Association's actions as they relate to the policies-and-procedures prong of the statutory test for an exemption.

### IV.

The district court found that several of the six factors listed in the regulations are inap-

---

behalf of Herron v. Blackwell, 908 F.2d 864, 870 (11th Cir.1990). In the instant case, however, the government produced direct evidence of discrimination, negating the need to use the *McDonnell Douglas* test. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). Accordingly, we proceed to consider the merits of the Association's affirmative defense.

7. District Court Order of June 5, 1992 at 7.

plicable to the instant situation because of the Association's particular function in the community. For example, the court concluded that the requirements concerning the manner in which the housing is described and advertised are inapplicable to the instant case because the Association bears no responsibility for attracting future residents. The court also noted the limited application of the fourth requirement pertaining to lease provisions because the community predominantly consists of family-owned homes. We agree with the district court's decision to disregard these three criteria because they have limited use given the specific facts of this case.

### A.

■ The district court made findings as to the factor regarding age-verification procedures and determined that the Association met its burden with regard to this criterion.[8] The court decided that the actions of the Association's board and its welcoming committee satisfied the requirement. We conclude that the court erred as a matter of law, however, in failing to consider the status of these procedures at the time of the discriminatory acts against the Massaros and the Mirabiles and overlooking pertinent evidence concerning the Board and welcoming committee.

According to the evidence presented at trial, the Association conducted three surveys of its residents, two of which occurred prior to the actions against the Massaros and Mirabiles. The first survey was distributed in January of 1989 and asked the respondent to indicate how many occupants were over 62 years of age and how many were over 55. A second census was distributed in December

of 1989 and also requested information on the age of the occupants of Mainlands. Neither survey, however, required any independent verification of the ages of the occupants.[9] The language of the regulation indicates that the surveyor must verify the age of residents. Moreover, verify is commonly defined as providing proof.[10] Several HUD administrative decisions indicate that copies of drivers' licenses or birth certificates are acceptable ways to verify ages of residents. *See HUD v. Murphy*, Fair Hous.—Fair Lend. Rep. (PH) ¶ 25,017, 25050 (HUD ALJ 1990); *HUD v. TEMS Association, Inc.*, Fair Hous.—Fair Lend. Rep. (PH) ¶ 25,028 (HUD ALJ 1992). In addition, the person responsible for gathering the second survey testified that he told residents that the survey was being taken so that the Association could prevent children from living in the community. This suggests that the age verification procedure was aimed more at excluding children than at including older persons.[11]

A third survey was conducted from December of 1990 through April of 1991. Although the persons conducting this census did obtain adequate age verification, on the facts of this case its import is minimized because it took place after the alleged discriminatory actions.

■ The district court found that the welcoming committee contributed to age verification. The committee, however, only met with new owners or occupants after they had moved into the complex.[12] The welcoming committee had no means of enforcing the age restriction and could not require that persons

8. The district court cautioned that this factor has limited relevance because the statute and regulations are written to address a situation with a single owner or manager who easily can enact such procedures. We agree with the district court and conduct a limited review of these procedures cognizant of the Association's organizational limitations.

9. Ms. Goulart, the former secretary of the Association, testified that the second survey in December of 1989 asked for a drivers' license number. Tr. at 123. There was no further testimony that respondents gave their number or that the number was ever used to verify ages. Mr. Semenik, a member of the Association's Board, testified that

the survey requested social security numbers because the Board believed that it could obtain age information from this number. Tr. at 643. It was noted, however, that social security cards do not contain any indication of age or date of birth. Mr. Conn, president of the Association, testified that this survey did not contain any age verification. Tr. at 249.

10. Verify means "to confirm or substantiate by oath or proof." *Webster's Third New International Dictionary* 2543 (3rd ed. 1986).

11. Tr. at 365, 367.

12. Tr. at 397.

meet with them. Moreover, the welcoming committee did not distribute census forms to verify ages of residents until 1991, after the alleged discriminatory acts.[13] Thus, we conclude that the Association had not instituted age-verification procedures adequately evidencing an intent to provide housing for persons 55 years of age or older prior to taking action against the Massaros and the Mirabiles. In holding to the contrary, the district court erred.[14]

### B.

■ The fifth factor for determining whether there was an intent to provide housing for older persons is the existence of written rules and regulations. The district court determined, and we agree, that this factor is relevant to the instant case. Indeed, this factor was the subject of heated dispute throughout the litigation. The district court decided that the community met this requirement because it passed a valid bylaw amendment limiting residency to persons over age 55. It was established, however, that the only written rule that existed prior to the action against the Massaros was the prohibition in the declaration of restrictions on occupancy by children.[15] The bylaw amendment was not enacted until April of 1990, months after the Massaros received their letter from the Association. The district court erred in failing first to consider whether the Association met its burden with respect to the Massaros before analyzing the bylaw, which only applies to the Mirabiles' situation.

The declaration's restriction on residency by children cannot show that the community intended its housing to be for older persons because then any policy against families would suffice for the exemption, swallowing the rule against such discrimination. Moreover, this court previously has held that a condominium complex failed to adhere to policies and procedures when the complex only had a prohibition in the declaration against children under 16 years of age. *Seniors,* 965 F.2d at 1033.[16]

In holding that the declaration's rule against residency by those under 16 years of age is not a sufficient basis for the exemption, we are not contradicting legislative history which suggests that Congress did not intend to deny communities the exemption because they had preexisting restrictions which were lower than the 55-year minimum. When the Fair Housing Act Amendments were discussed before the Senate, Senator DeConcini asked Senator Kennedy, as sponsor of the bill, whether a community with a preexisting restriction lower than the age in the Act could qualify for the exemption assuming that the community currently meets the criteria for an exemption and that the preexisting restrictions are not applied in a manner that conflicts with the Act. Senator Kennedy responded that the community could qualify for the exemption "contingent upon the community meeting the exemption requirements and not enforcing any pre-existing restriction in a manner inconsistent with the act." 134 Cong.Rec. S 10549 (daily ed. Aug. 2, 1988). In the instant case, most of the criteria which could otherwise qualify the community are inapplicable. Moreover, the applicable criteria, including age verification, are not adequate and the community is only enforcing its restrictions to exclude children in a manner inconsistent with the Act. Thus, our holding in this case is limited to these facts and is not inconsistent with the legislative intent expressed by Senators Kennedy and DeConcini.

■ The Association contends that the declaration of restrictions prohibited any amendments before 1991 and that a Broward County ordinance banned discrimination against those under 55 years of age until the ordinance was repealed in March of 1990.

---

13. Tr. at 398.

14. We hold that the district court erred as a matter of law in failing to distinguish between actions that occurred before the alleged discriminatory acts and those that took place later. In addition, the court erred in failing to consider pertinent facts. After considering these critical facts as well as the timing of the Association's actions, we conclude that there is insufficient evidence to establish the Association's eligibility for the exemption with respect to the age verification procedures at the time that letters were sent to the Massaros and Mirabiles.

15. Tr. at 246.

16. The facts upon which the appellate court based its decision are recounted in the district court's opinion, *Seniors Civil Liberties Ass'n, Inc. v. Kemp,* 761 F.Supp. 1528, 1535 (M.D.Fla.1991).

Thus, the Association could not enact other rules or regulations concerning age restrictions to demonstrate its intent to provide housing for older persons. The fact that the development's self-imposed rule and local ordinances render it more difficult for the Association to qualify for the exemption, however, does not mitigate its burden under the Act. As previously noted, the Association bears the burden of establishing its eligibility and the exemptions are to be narrowly construed to enforce the goals of the Act. *See Rogers*, 967 F.2d at 527; *Elliott*, 960 F.2d at 979. In addition, HUD has stated that the Fair Housing Act does not preempt state or local laws that are not discriminatory even if the state or local law renders it more difficult or even impossible to qualify for an exemption under the Act.[17]

■ After the county ordinance was lifted, the Association passed a bylaw amendment that increased the age restriction from sixteen to fifty-five years of age, the age limit of the Fair Housing Act. This bylaw was passed after the Massaros received their letter, but before the Association took action against the Mirabiles, so it is applicable only to the Mirabiles' case. The United States contends that the bylaw is invalid and unenforceable.

The district court found that the bylaw was validly enacted. The court erred as a matter of law, however, in concluding that this finding is sufficient or necessary to establish an intent to provide housing for older persons. We hold that the rule itself is insufficient to qualify the community for the exemption because the regulations contemplate balancing various factors and thus, the rule must be weighed in the overall evaluation of the community's intent that the housing be for older persons.

Moreover, it is unnecessary to decide the state law issue concerning the bylaw's validity because the federal statute and regulations are more concerned with the intent of the community. The district court correctly noted that HUD's regulations "take their cue from the statute, and discuss the relevant factors in terms of the owner or manager's compliance with the published policies and procedures."[18] We give deference to an agency's construction of the statute and hence, look to the Association's procedures and actions taken in response to the bylaw age restriction. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (deferring to an agency's interpretation of the statute if it is based on a permissible construction and is reasonable).

The bylaw amendment states in pertinent part that

[n]o permanent occupancy of any lot shall be permitted by an individual between the ages of eighteen (18) and fifty-five (55). Notwithstanding same, the Board in its sole discretion shall have the right to establish hardship exceptions to permit individuals between the ages of eighteen (18) and fifty-five (55) to permanently reside in the community, providing that said exceptions shall not be permitted in situations where the granting of a hardship exception would result in less than 80% of the lots in the community having less than one resident fifty-five (55) years of age or older....[19]

The bylaws further provide that the Board shall develop procedures to carry out the purpose of this bylaw. The district court found that the Board had sent letters to realtors stating that the Mainlands Sections One and Two was housing for older persons and that the Board instituted screening pro-

---

17. HUD noted that many of the California mobile parks have complained that they are unable to qualify for an exemption for older persons' housing because state law requires that a homeowner be notified six months prior to amendments to rules and regulations governing the park. The state law makes it difficult and in some cases impossible to qualify for the exemption under the transition provision of the Act, which allows a community to qualify even if previous occupants do not meet the age require-

ment of the Act as long as new residents are over the age limit. Senators Kennedy and Specter and Representative Edwards also expressed the opinion that Congress did not intend to preempt local laws. 24 C.F.R. Ch. 1, Subch. A, App. I at 902.

18. District Court Order of June 5, 1992 at 7.

19. R1–20 at 8.

cedures through its welcoming committee. The court erred again in considering the Association's acts after the date of the discriminatory practices and in overlooking pertinent facts.[20]

A member of the Board testified that there was no screening committee per se until after September 7, 1990, the date of the eviction letter to the Mirabiles.[21] The screening procedure was further flawed because some realtors refused to abide by the Association's request concerning these procedures.[22] The realtors were not convinced that the community qualified for the exemption because the deed of restrictions had not been amended and thus, they did not feel bound by the age limitation.[23]

Furthermore, most of the persons were "screened" after they had become a homeowner in the community; others moved in without coming to the attention of the committee.[24] None of the new residents under the age limit requested a hardship exemption from the Board.[25] Although some persons under 55 submitted applications and had interviews, the committee did not issue hardship exemptions as required by the bylaws nor did it take any measures to evict persons under 55.[26] The only persons who were asked to leave the community were those with children.[27] *See TEMS*, Fair Hous.— Fair Lend.Rep. (PH) ¶ 25,028 (fact that housing association selectively allowed under–55–year–olds to inhabit homes as long as they did not have children indicated that the community did not have adequate policies and

procedures to qualify for exemption). In addition, rules concerning fees for approval applications appeared to be waived without any process or reason.[28] It appears from these facts that the Board failed to develop a credible process for enforcing the bylaws and accordingly, new residents and realtors did not adhere to the policy.

Most important, the secretary of the Association, Ms. Goulart, acknowledged that she did not believe that the bylaw amendment was enforceable. When plaintiff's counsel stated that the Association had done nothing to stop adults under age 55 from moving into the Mainlands, Ms. Goulart replied, "How could we stop them?"[29] Moreover, she acknowledged that the Association has a rule providing that it could exclude persons under 55, but she believed that the Association could not actually exclude such persons. Ms. Goulart then distinguished between the bylaws, which she considered unenforceable, and the declaration of restrictions, which could be enforced.[30] Mr. Semenik, a member of the Board of the Association, also agreed that the Association could take no action to prevent persons under age 55 from moving into the community.[31]

The Association argues that it is not required to take any action against persons under 55 years of age until the community is in danger of dropping below 80%, the percentage of homes which must be occupied by at least one person over 55 years of age to qualify for the exemption. The statute, however, requires that the Association demon-

---

20. After considering the timing of events and additional pertinent facts, we conclude that insufficient evidence exists to constitute an adherence to and enforcement of the bylaw amendment.

21. Tr. at 652.

22. Mr. Conn, president of the Association, testified that "[t]he real estate people didn't bring that many people to be screened. They had a field day." Tr. at 258.

23. Tr. at 259.

24. Tr. at 640.

25. Tr. at 134.

26. *Id.*

27. These persons included the Mirabiles and Massaros and Ms. Gina Marsey, a renter with children. Ms. Marsey was visited by Mr. Conn, the Association president, and told about the declaration of restrictions prohibiting children. She moved shortly after her discussion with Mr. Conn. This interview took place after the Massaros had filed their complaint with HUD in April of 1990, but Mr. Conn did not remember if the amendment to the bylaws was in effect at the time. Tr. at 256.

28. Tr. at 142–43.

29. Tr. at 138.

30. Tr. at 140.

31. Tr. at 640.

strate an intent to provide housing for older persons; the regulations then list six factors that can be used to establish this requisite purpose. Because so many of these factors were inapplicable to the Association and its only other rule was the prohibition against children, the amended bylaw was the Association's evidence of intent.[32] The Association, however, cannot rely exclusively on the existence of the rule because the regulations contemplate balancing the various criteria and we must weigh the sixth factor—the enforcement of and adherence to the policy. We conclude that the Association's lack of procedures shows a failure to adhere to the amendment.[33] In addition, the Association's secretary and a member of the Board testified that they did not believe that the bylaw was enforceable and thus, they did not enforce it. Therefore, the Association has failed to satisfy the criteria of the regulations and cannot meet the "policies and procedures" prong of the statutory test for the exemption.[34]

### V.

We hold that the Association did not qualify for the older-persons exemption at the time of its actions against the Massaros and Mirabiles.[35] The district court's order is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

**32.** Mr. Conn, the president of the Association, testified that the Association had no policies and procedures in place to qualify for the exemption until the bylaw amendment was enacted in April 1990. Tr. at 325.

**33.** The Association repeatedly asserted that it was not attempting to enforce the bylaws against the Massaros and the Mirabiles. Because the Association was not acting on the basis of the bylaw amendment, we do not reach the issue of the legality of such an enforcement action. We look to the Association's adherence and enforcement procedures with respect to the bylaws only to establish the intent of the Association.

**34.** Whether the ultimate issue in this case is a question of fact or a mixed question of law and fact presents a difficult problem. We need not

resolve this issue, however, because even assuming the more deferential standard of review, we hold that given the lack of supporting evidence at the time of the discriminatory acts, the district court clearly erred in its conclusion that the Association established sufficient policies and procedures to prove an intent to provide housing for older persons.

**35.** We express no opinion on the validity or enforceability of the current bylaw, nor do we hold that the Association is permanently enjoined from enforcing its declaration of restrictions, because different facts would require a new balancing test.