**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PUTNAM FAMILY PARTNERSHIP;
MISSION VALLEY OAKS, LLC;
CARAVAN ESTATES, LLC; and
DEJAGER CHILDRENS TRUST,
              *Plaintiffs-Appellants,*

              v.

CITY OF YUCAIPA, CALIFORNIA,
              *Defendant-Appellee.*

No. 10-55563

D.C. No.
5:09-cv-02203-
VAP-OP

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
November 8, 2011—Pasadena, California

Filed February 17, 2012

Before: Ferdinand F. Fernandez, Karen Nelson Moore,* and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Moore

---

*The Honorable Karen Nelson Moore, Circuit Judge for the United
States Court of Appeals for the Sixth Circuit, sitting by designation.

**COUNSEL**

Elliot L. Bien and Amy E. Margolin, Bien & Summers, Novato, California; Terry R. Dowdall, Dowdall Law Offices, APC, Orange, California, for the appellants.

Michael Estrada, City Attorney, City of Yucaipa, Yucaipa, California; Rochelle Browne and Steven L. Flower, Richards, Watson & Gershon, Los Angeles, California, for the appellee.

---

**OPINION**

KAREN NELSON MOORE, Circuit Judge:

Four mobilehome park owners in Yucaipa, California appeal the dismissal of their suit under the Fair Housing Amendments Act of 1988 ("FHAA") challenging a city zoning ordinance prohibiting any mobilehome park currently operating as senior housing from converting to all-age housing. Because the FHAA is silent on whether such senior-housing zones are permissible and because federal regulations allow for them, we AFFIRM the judgment of the district court.

## I.  BACKGROUND

In September 2009, the City of Yucaipa, California ("the City") adopted Ordinance Number 289 ("the Ordinance"), which amended the City's land-use plan by creating a Senior Mobilehome Park Overlay District (the "Overlay District"). The Ordinance prohibits any of the twenty-two mobilehome parks in the City that currently operate as senior housing, defined as a park in which either eighty percent of the spaces are occupied by or intended for occupancy by at least one person who is age fifty-five or older or one hundred percent of the spaces are occupied by or intended for occupancy by peo-

ple who are age sixty-two or older, from converting to all-age housing. Yucaipa, Cal., Ordinance 289 §§ 7, 8 (Sept. 28, 2009). Specifically, the Ordinance requires that "[a]t least 80% of the spaces in mobilehome parks in the Senior Mobilehome Park Overlay District shall be occupied by at least one person 55 years of age or older," and that "[t]he signage, advertising, park rules, regulations, rental agreements and leases for spaces in a Senior Mobilehome Park in the MHP2 Overlay District shall state that the park is a senior park." *Id.* § 9. Among its findings accompanying the Ordinance, the Yucaipa City Council described the need to preserve affordable housing and independent living options for the City's significant senior population,[1] as well as to protect the reliance interests of those seniors who had purchased homes in existing senior-housing parks.

Plaintiffs-Appellants Putnam Family Partnership, Mission Valley Oaks, Caravan Estates, and Dejager Children's Trust (collectively, "Putnam"), mobilehome park owners that currently operate senior-housing parks in Yucaipa, filed suit, alleging that the Ordinance violated the FHAA by forcing them to discriminate on the basis of familial status, *see* 42 U.S.C. § 3604, and by interfering with their ability to "aid[ ] or encourage[ ]" families with children in the enjoyment of fair housing rights, *id.* § 3617. Putnam also argued that the Ordinance was preempted by the FHAA because it required Putnam to take action that the FHAA prohibited. *See id.* § 3615. In addition to these federal-law claims, Putnam alleged violations of California housing law. The City filed a motion to dismiss for failure to state a claim, arguing that the Ordinance fell within the FHAA's senior exemption, which allows communities that provide "housing for older persons" to exclude families with children. *Id.* § 3607(b)(1). The City contended that, as amended by the Housing for Older Persons

---

[1]Twenty-four percent of the City's population is age fifty-five or older, as compared to just under fifteen percent of the population of San Bernardino County as a whole.

Act of 1995 ("HOPA") and as interpreted by Department of Housing and Urban Development ("HUD") regulations in 1999, the senior exemption applied to city-zoned senior housing like the Overlay District. Putnam argued that the senior exemption did not apply because the senior exemption requires that the housing provider intend to operate senior housing, and Putnam lacked this intent.

The district court granted the City's motion to dismiss, holding that the Ordinance was covered by the federal senior exemption because, under the HOPA amendments, the required intent to provide senior housing need not be that of the private property owner. Because the City enacted the Ordinance, the court held, the required intent to provide senior housing was that of the City rather than Putnam. The court rejected Putnam's arguments to the contrary as based on pre-HOPA language requiring that the owner or manager of the housing entity intend to provide senior housing for the senior exemption to apply. For similar reasons, the court held that the Ordinance was not preempted. After dismissing the federal claims, the court declined to exercise supplemental jurisdiction over the state-law claims. Putnam timely appealed, repeating its argument that the decision whether to operate senior housing belongs exclusively to the housing provider and, thus, that the intent to provide senior housing which the senior exemption requires must be that of Putnam, not the City. In addition, Putnam contends that the HUD regulations on which the district court relied are inconsistent with the statute or otherwise outside the scope of the agency's authority.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Decker v. Advantage Fund Ltd.*, 362 F.3d 593, 595-

96 (9th Cir. 2004). Dismissal is proper when, even if all material factual allegations in the complaint are taken as true, plaintiffs "can prove no set of facts in support of the claim that would entitle [them] to relief." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011). We likewise review de novo questions of statutory interpretation and of preemption. *Id.*

## B.   The Federal Senior Exemption

**[1]** As originally enacted, the federal Fair Housing Act prohibited, inter alia, discrimination in the rental or sale of a dwelling on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 3604(a) (1968). In 1988, Congress enacted the FHAA, which amended the Fair Housing Act to prohibit discrimination on the basis of familial status. 42 U.S.C. § 3604; *see also id.* § 3602(k) (defining "familial status" as children younger than eighteen living with a parent or legal custodian). The FHAA also provided two exemptions to the new prohibition against familial-status discrimination: the prohibition would not affect local, state, or federal restrictions on maximum occupancy and would not apply to "housing for older persons." *Id.* § 3607(b)(1). The senior exemption "permit[s] communities satisfying certain requirements to discriminate on the basis of familial status." *Balvage v. Ryderwood Improvement & Serv. Ass'n*, 642 F.3d 765, 769 (9th Cir. 2011). The senior exemption is an affirmative defense, for which the defendant has the burden of proving eligibility. *Id.* at 776 (citing *Massaro v. Mainlands Section 1 & 2 Civic Ass'n*, 3 F.3d 1472, 1475 (11th Cir. 1993)). Moreover, the defendant must show that all requirements for the senior exemption were met at the time of the alleged discriminatory act. *Id.*

Under the senior-exemption provision as originally enacted in the FHAA, "housing for older persons" included housing "intended and operated for occupancy by at least one person 55 years of age or older per unit." 42 U.S.C. § 3607(b)(2)(C)

(1988), *amended by* 42 U.S.C. § 3607(b)(2)(C) (1995). The FHAA further stated that,

> In determining whether housing qualifies as housing for older persons under this subsection, the [HUD] Secretary shall develop regulations which require at least the following factors:
>
>> (i) the existence of significant facilities and services specifically designed to meet the physical or social needs of older persons, or if the provision of such facilities and services is not practicable, that such housing is necessary to provide important housing opportunities for older persons; and
>>
>> (ii) that at least 80 percent of the units are occupied by at least one person 55 years of age or older per unit; and
>>
>> (iii) the publication of, and adherence to, policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older.

*Id.*

Focusing on the language in subpart (iii) that eligibility for the senior exemption requires that the owner or manager intend to provide senior housing, several district court cases held that a city could not interfere with a private housing entity's decision whether to meet the senior exemption. *Mobile Home Vill. Inc. v. Twp. of Jackson*, 3 Fair Hous.–Fair Lending (P-H) ¶ 16,018 (D.N.J. 1995) (holding senior-housing zoning ordinance invalid as applied); *Cedar Hills Developers, Inc. v. Twp. of Wyckoff*, 2 Fair Hous.–Fair Lending (P-H) ¶ 15,675 (D.N.J. 1990) (same); *see also United States v. City of Hay-*

*ward*, 805 F. Supp. 810, 812-14 (N.D. Cal. 1992) (city rent-control board's decision to reduce rent when mobilehome park owners opened the park to families with children violated the FHAA), *rev'd in part on other grounds*, 36 F.3d 832 (9th Cir. 1994).

**[2]** In 1995, Congress amended the requirements to qualify for the senior exemption. Under HOPA, "housing for older persons" remains exempt from the prohibition against familial-status discrimination. HOPA replaced the FHAA's definition of "housing for older persons" with a provision defining "housing for older persons" as housing

> (C) intended and operated for occupancy by persons 55 years of age or older, and—
>
>> (i) at least 80 percent of the occupied units are occupied by at least one person who is 55 years of age or older;
>>
>> (ii) the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent required under this subparagraph; and
>>
>> (iii) the housing facility or community complies with rules issued by the Secretary for verification of occupancy, which shall—
>>
>>> (I) provide for verification by reliable surveys and affidavits; and
>>>
>>> (II) include examples of the types of policies and procedures relevant to a determination of compliance with the requirement of clause (ii). Such surveys and affidavits shall be admissible in

administrative and judicial proceedings for the purposes of such verification.

42 U.S.C. § 3607(b)(2)(C).**²**

**[3]** The legislative history reveals that the central purpose of the HOPA amendments was the elimination of the FHAA's "significant facilities and services" requirement. *See, e.g.*, S. Rep. No. 104-172, at 2 (1995) ("The purpose of H.R. 660 is to eliminate the burden of the 'significant facilities and services' requirement in the seniors housing exemption of the Fair Housing Act."), *reprinted in* 1995 U.S.C.C.A.N. 778, 779. The House and Senate Judiciary Committee Reports criticized administrative interpretations of that provision that made compliance with the senior exemption difficult and thus limited the availability of senior housing. *Id.* at 5-6; H.R. Rep. No. 104-91, at 2-4 (1995), 1995 WL 136513, at *2-4. The Senate Report also expressed Congress's desire to clarify whether housing qualifies for the senior exemption and its general purpose "to preserve housing for older persons." S. Rep. No. 104-172, at 2, 6.

**[4]** HOPA also removed the FHAA's requirement that the intent to provide senior housing demonstrated in published policies and procedures must be that of the "owner or manager." In addition, HOPA specified that the duty to publish and adhere to such policies and procedures lies with the "housing facility or community." 42 U.S.C. § 3607(b)(2)(C)(ii). Unlike with the elimination of the "significant facilities and services" requirement, however, the legislative history does not offer a reason for the deletion of the reference to "owner or manag-

---

**²**The senior exemption also applies to housing "provided under any State or Federal program that the Secretary determines is specifically designed and operated to assist elderly persons (as defined in the State or Federal program)" or "intended for, and solely occupied by, persons 62 years of age or older." 42 U.S.C. § 3607(b)(2)(A), (B). Neither of these situations is presented in this case.

er." Nor do the statute or the committee reports define "housing facility or community" or otherwise explain why that phrase was added.

In 1999, HUD issued regulations interpreting the amended senior exemption. The agency defined "housing facility or community" as "any dwelling or group of dwelling units governed by a common set of rules, regulations or restrictions." 24 C.F.R. § 100.304(b). As non-exclusive examples, HUD listed a condominium association, a cooperative, property governed by a homeowners' association, leased property under common private ownership, a mobile home park, a manufactured housing community, and, most notably for this case, "[a] municipally zoned area." *Id.* The HUD regulations also explained how a housing facility or community could satisfy the senior exemption's requirement that it "publish and adhere to policies and procedures that demonstrate its intent to operate as [senior] housing." *Id.* § 100.306. In an appendix to the final rule intended "to provide guidance to housing facilities or communities in applying these HUD requirements," the agency listed specific examples of how various facilities and communities could meet this intent requirement. 64 Fed. Reg. 16324, 16331, 16332 (Apr. 2, 1999). One such example dealt with a zoned area:

> An area zoned by a unit of local government as "senior housing" satisfies the intent requirement if:
>
> (1)  Zoning maps containing the "senior housing" designation are available to the public;
>
> (2)  Literature distributed by the area describes it as "senior housing";
>
> (3)  The "senior housing" designation is recorded in accordance with local property recording statutes; and

>    (4)   Zoning requirements include the 55-or-older
>          requirement or a similar provision.

*Id.* at 16332 ex.2. The appendix also explained that, overall, the regulations were intended to reflect HOPA's goal of "protect[ing] senior housing." *Id.* at 16325.

## C.   The Validity of the City of Yucaipa's Ordinance 289

### 1.   Does the Ordinance Violate the FHAA?

Putnam contends that the Ordinance violates the FHAA by requiring that Putnam discriminate against families with children and by interfering with its ability to aid such families in the exercise of their fair housing rights. As described above, however, discrimination on the basis of familial status does not violate the FHAA if the federal senior exemption applies because the FHAA's ban on such discrimination does not apply to "housing for older persons." 42 U.S.C. § 3607(b)(1). If the requirements for the senior exemption are met, any limits that the Ordinance places on Putnam's ability to sell units in its mobilehome park are lawful under the FHAA and Putnam has thus failed to state a claim for violation of the FHAA.

Putnam contends that the federal senior-exemption requirements are not met if the "on-site housing provider" lacks the intent to operate senior housing, and, thus, that the senior exemption does not apply when a city forces an unwilling housing provider to operate senior housing.[3]

---

[3]Although it is uncontested that Putnam currently meets the requirements for the federal senior exemption and operates as senior housing, *see* First Amended Complaint ("Compl.") at 3, 6-7 (noting that, as of the filing of the complaint, none of the park owners had "actually cho[sen] to amend their rules and regulations to allow for 'familial status' housing"), Putnam asserts that it has the right to convert to all-age housing. *See id.* at 3. Even if Putnam's litigation position signals an abandonment of its historical

The City counters that the senior exemption does not require that the housing provider has the intent to operate senior housing; when a city seeks to provide senior housing through the exercise of its zoning authority, the intent to provide senior housing can be that of the city itself. As long as the other requirements for the senior exemption are met, the City asserts that any discrimination against families with children that results from the Ordinance does not violate the FHAA.

### a. The Relevant Intent

**[5]** The question of whether the federal senior exemption can apply when the intent to provide senior housing is that of a city is apparently one of first impression in the courts of appeals. By including "[a] municipally zoned area" as an example of a "housing facility or community" that can qualify for the senior exemption, the HUD regulations clearly allow city-zoned senior housing like the City's Overlay District. *See* 24 C.F.R. § 100.304(b). Further, HUD has explained that a housing facility or community satisfies the senior exemption's intent requirement if, inter alia, "[z]oning requirements include the 55-or-older requirement" and "[z]oning maps containing the 'senior housing' designation are available to the public." 64 Fed. Reg. at 16332 ex. 2. These actions reflect the

---

intent to operate as senior housing, it is still uncontested that the other requirements—an eighty-percent senior population, adherence to published policies and procedures, and compliance with HUD age-verification rules—are currently met.

A different question may be presented if the Ordinance required parks that did not already maintain an eighty-percent senior population or describe themselves as senior parks to do so, but we leave that question for another day. We do note, however, that the fact that Putnam already operates as senior housing in compliance with the federal senior exemption further distinguishes this case from our pre-HOPA decision in *City of Hayward*, 36 F.3d at 836-38.

City's intent to provide senior housing, because they are actions that the City undertakes.

We will defer to an agency's interpretation of a statute that it is charged with implementing if the statute is ambiguous and the agency's interpretation is reasonable. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). A statute is ambiguous if Congress has not "directly spoken to the precise question at issue." *Id.* at 842. We routinely "defer to HUD's reasonable interpretation of the FHA[A]." *Balvage*, 642 F.3d at 775 (citing *Meyer v. Holley*, 537 U.S. 280, 287-88 (2003)).[4]

In determining whether a statute is ambiguous, we apply the traditional tools of statutory construction, including looking to the plain meaning of the text or the underlying purpose of the statute. *See Chevron*, 467 U.S. at 843 n.9.

The FHAA's senior-exemption provision, as amended by HOPA, refers to "intent" in two places. First, the statute requires that housing be "intended and operated for occupancy by persons 55 years of age or older," 42 U.S.C. § 3607(b)(2)(C), but does not explain whose intent to provide senior housing is required. Second, the statute requires that "the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent required

---

[4]Although the appendix containing Example 2 was not codified as part of the final rule in the Code of Federal Regulations, it was included in the notice of proposed rulemaking and was thus subject to notice and comment. *See* 62 Fed. Reg. 2000, 2005 (Jan. 14, 1997). Even if the appendix lacks the force of law and does not merit *Chevron* deference, it is HUD's interpretation of HUD's own regulation and is thus "controlling unless 'plainly erroneous or inconsistent with the regulation.' " *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). The appendix is also worthy of *Skidmore* deference "according to its persuasiveness." *United States v. Mead Corp.*, 533 U.S. 218, 221 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

under this subparagraph," *id.* § 3607(b)(2)(C)(ii). This second reference to "intent" clarifies that the intent to provide senior housing must be that of the "housing facility or community."**⁵**

Putnam contends that, as a linguistic matter, a city cannot qualify as a "housing facility or community." Whatever the lexical merits of this argument, it is not dispositive of the issue of whether a city's intent to provide senior housing can trigger the federal senior exemption. Even if the city as a whole is not a housing facility or community, a municipally zoned area which the city created can be. Further, as the district court recognized, "[b]ecause the Ordinance creating the municipally zoned area was enacted by the City, the relevant inquiry is the intent of the *City.*" Dist. Ct. Op. at 8-9. Just as the intent of a mobilehome park might be the intent of the company that owns the park or the intent of the residents who live there, the intent of a municipally zoned area is the intent of the city that created it. The City made the decision to zone the area as senior housing and provided the common set of rules that made it a community. Thus, the more precise question is whether the Overlay District which the City created can qualify as a "housing facility or community."

Neither the statute nor the committee reports on HOPA define "housing facility or community." We need not consider what this phrase could mean in the abstract, however, as the

---

**⁵**We note that the text is actually somewhat ambiguous on this point. The statute does not require "policies and procedures that demonstrate an intent by the housing facility or community," but rather requires "policies and procedures that demonstrate the intent required under this subparagraph," 42 U.S.C. § 3607(b)(2)(C)(ii), a reference to housing "intended and operated for occupancy by persons 55 years of age or older," *id.* § 3607(b)(2)(C). In regulations explaining how a housing facility or community can meet the "policies and procedures" requirement, however, HUD states that "a housing facility or community . . . must publish and adhere to policies and procedures that demonstrate *its* intent to operate as housing for persons 55 years of age or older." 24 C.F.R. § 100.306(a) (emphasis added).

text and history of the senior-exemption provision provide some clarification as to what it means in this context. A "housing facility or community" must be able to "publish[ ] and adhere[ ] to policies and procedures that demonstrate the intent" to provide senior housing, 42 U.S.C. § 3607(b)(2)(C)(ii), and must be able to "compl[y] with rules issued by the Secretary for verification of occupancy," *id.* § 3607(b)(2)(C)(iii). Further, the universe of entities that can qualify as housing facilities or communities must be broader than the owners or managers of the housing that will be operated as senior housing, because HOPA added "housing facility or community" when it deleted the FHAA's requirement that "an intent by the owner or manager to provide [senior] housing" be demonstrated for the senior exemption to apply.

The natural reading of "housing facility or community" is a group of dwellings bound together by shared characteristics, such as a common set of rules or a shared governing structure. In the context of the senior exemption, the relevant shared characteristic would be a common set of rules that determine who can rent or buy one of the dwellings. As amended by HOPA, the FHAA does not address whether the residency rules for the dwellings within the housing facility or community must be adopted internally or can instead be imposed by a city through the exercise of its zoning authority. Moreover, the statute is silent as to situations in which various actors affiliated with the housing disagree over whether it should operate as senior housing—for example, when a condominium association wants to operate as senior housing but some of the individual owners of the condominiums do not.

**[6]** The senior-exemption provision's requirement that "the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent" to provide senior housing makes clear that "housing facility or community" also refers to the entity with the power to issue and enforce age restrictions. *Id.* § 3607(b)(2)(C)(ii).[6] The statute

---

[6]Putnam argues that zoning laws are not "policies and procedures," but we believe that the age restriction is the relevant policy, regardless of how

does not place limits on or otherwise explain what kind of entity can exercise this power; we know that entities other than the owners or managers of the housing that will be operated as senior housing can do so, but Congress has provided no further guidance.[7]

As amended by HOPA, the FHAA thus does not expressly address whether a city's intent can qualify housing for the senior exemption. Nothing in the text or the relevant legislative history either clearly permits or precludes a determination that the required intent comes from a city.[8]

it is promulgated. Moreover, a law certainly sets forth policies and procedures. The other FHAA provision which Putnam identifies that specifically refers to local laws is distinguishable. Section 3604(f)(5)(A) provides that housing entities are deemed to comply with required federal accessibility standards by complying with state or local laws that incorporate the federal standard. This provision refers exclusively to governmental requirements, while the senior exemption refers to actions that could be taken by either private entities or local governments. The latter's use of the more inclusive phrase "policies and procedures" rather than "laws" thus does not clearly exclude zoning ordinances.

Putnam also points to § 3607(b)(1), which explains that other provisions in the FHAA do not limit the applicability of "reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." If local laws can be "restrictions," however, we believe that they can also be "policies and procedures."

[7]Even before HOPA, when the senior exemption required the intent of the owner or manager to provide senior housing, the Eleventh Circuit held that a neighborhood association that did not own, rent, sell, or advertise the housing could claim the senior exemption because the association "regulate[d] the use of the homes . . . by amending the [age] restrictions" and "ha[d] the power to enforce the [age] restrictions and thus[ ] to exclude persons from occupancy in the homes." *Massaro*, 3 F.3d at 1477. Because the association "perform[ed] functions which are relevant to the goals of the [FHAA]," it was subject to the FHAA's prohibition on familial-status discrimination and was also eligible for the FHAA's senior exemption. *Id.* Like the association in *Massaro*, the City has the power to issue and enforce age restrictions that comply with the FHAA and with HOPA.

[8]Putnam emphasizes the lack of express authorization for senior-housing zones in the statute or legislative history as support for its posi-

The public policy underlying the FHAA does not conclusively favor one reading of the statute. As a general matter, the primary goal of the FHAA is to limit discrimination in the housing arena, and senior housing is a permissible exception to the rule. Yet the FHAA created the senior exemption at the same time as the prohibition on familial-status discrimination. Furthermore, HOPA, which passed both Houses of Congress nearly unanimously, focused on the "need to preserve housing for older persons" in expanding the availability of the federal senior exemption. S. Rep. No. 104-172, at 6. Finally, deference is particularly appropriate when we are dealing with interpretive decisions that Congress would likely have chosen to delegate to the agency. Congress may well prefer to delegate the task of balancing competing policies and interests, especially when (as with seniors and families), both are popular.

**[7]** Considering both the text and the underlying purpose of the FHAA, as amended by HOPA, we conclude that Congress has not "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Instead, Congress likely "did not actually have an intent," *id.* at 845, regarding senior-housing zones when it enacted HOPA. Therefore, we defer to HUD's definition of "housing facility or community" as "any dwelling or group of dwelling units governed by a common set of rules, regulations or restrictions," and its inclusion of a "municipally zoned area" as an example, to the extent that the definition is reasonable. *See* 24 C.F.R. § 100.304(b).

Municipally zoned senior housing is consistent with Congress's efforts in enacting HOPA to "preserve housing for

_____

tion. Although the "dog that didn't bark" may have helped Sherlock Holmes solve the case in "Silver Blaze," legislative silence is generally a tenuous basis for statutory construction. *See Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1007 (9th Cir. 2006) ("[W]e do not apply a 'dog that didn't bark' theory of statutory construction . . . .") (quoting *Patenaude v. Equitable Life Assurance Soc'y*, 290 F.3d 1020, 1025 (9th Cir. 2002)).

older persons." S. Rep. No. 104-172, at 6. Further, such zoning policies do not undermine the FHAA's protection of families with children. Especially when the housing entities within the zoned area already operate as senior housing, municipal zoning does not represent as significant an expansion of the federal senior exemption as Putnam fears. Here, the City must ensure that the Overlay District meets the fairly rigorous statutory requirements of maintaining an eighty-percent senior population, publishing and adhering to policies, and complying with occupancy verification rules, *see* 42 U.S.C. § 3607(b)(2)(C), and that the Overlay District does so in advance of engaging in what would otherwise be discriminatory conduct, *see Balvage*, 642 F.3d at 776.

Allowing the intent to provide senior housing to be that of a city still ensures that such operation is, in fact, intentional—that the true reason for the exclusion of families with children is to provide senior housing, rather than animus against families with children. As long as the decision to provide senior housing is intentional, whether that intent belongs to a city or a housing provider is irrelevant. Moreover, the most important aspect of the intent requirement is that the intent be demonstrated in published policies, *see* 42 U.S.C. § 3607(b)(2)(C)(ii), which give notice to tenants and potential tenants and ensure that age requirements are applied consistently. Ordinance 289 satisfies this purpose.

### b. HUD's Authority

Putnam also argues that, apart from issues of ambiguity or reasonableness, we should not consider the HUD regulations because Congress did not grant the agency authority to define "housing facility or community." Congress has invested the HUD Secretary with rulemaking authority, *id.* § 3535(d), and with the general "authority and responsibility for administering this Act," *id.* § 3608(a). Although Congress did not expressly direct HUD to define "housing facility or community," Congress did not define that phrase itself, and as the

Supreme Court recognized in *Chevron*, "[s]ometimes the leg-islative delegation to an agency on a particular question is implicit rather than explicit," 467 U.S. at 844. Moreover, HOPA instructed HUD to illustrate how a housing facility or community could demonstrate the intent to provide senior housing. 42 U.S.C. § 3607(b)(2)(C)(iii)(II). HUD's Example 2, which explains that a housing community satisfies the intent requirement if, inter alia, "[z]oning requirements include the 55-or-older requirement," 64 Fed. Reg. at 16332 ex 2., is an exercise of this expressly delegated authority.

Moreover, HOPA did not limit HUD's regulatory authority regarding the senior exemption to the extent that Putnam con-tends. HOPA deleted language directing HUD to develop reg-ulations to "determin[e] whether housing qualifies as housing for older persons," but the amended law still provides for agency involvement in setting qualifications for the senior exemption by directing HUD to issue rules for verification of occupancy and to provide examples of policies and proce-dures that would satisfy the intent requirement. 42 U.S.C. § 3607(b)(2)(C)(iii). Although the legislative history shows that a major purpose of the HOPA amendments was to over-turn administrative interpretations of the FHAA's "significant facilities and services" requirement that Congress believed were unduly limiting eligibility for the senior exemption, the remedy was removing that requirement rather than cabining HUD's general authority to issue regulations.

### c. Age Verification

Putnam's final argument is that, even if senior-housing zones are permissible as a general matter, the City's Overlay District does not qualify for the federal senior exemption because the Ordinance does not contain a mechanism for meeting HUD's occupancy-verification rules. *See id.*; 24 C.F.R. § 100.307. Putnam raises this issue for the first time on appeal. We generally do not review issues that the parties did not raise below, and will do so only in narrow circumstances.

*Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1488 (9th Cir. 1995). Putnam asserts that such circumstances are met here because the age-verification issue presents a pure question of law. *See id.* However, whether the Overlay District has complied with age-verification rules involves questions of fact. Even though the Ordinance does not mandate compliance with these rules, we cannot determine solely by reading the Ordinance whether such rules were in fact complied with. The issue is therefore waived, and we will not address it.

### 2.  Does the FHAA Preempt the Ordinance?

Putnam's second claim—that the FHAA preempts the Ordinance—is a variation on the theme of its first claim. In light of our analysis above, Putnam's preemption arguments likewise fail.

Putnam contends that the FHAA expressly preempts the Ordinance because the Ordinance requires Putnam to exclude families with children and "any [state or local] law . . . that purports to require or permit any action that would be a discriminatory housing practice under [the FHAA] shall to that extent be invalid." 42 U.S.C. § 3615. As explained above, however, any discrimination against families that results from the Ordinance is not a discriminatory housing practice under the FHAA because Ordinance's Overlay District falls within the federal senior exemption.

[8] Federal law impliedly preempts a state or local law if "it is 'impossible for a private party to comply with both [local] and federal requirements,' " *PLIVA, Inc. v. Mensing*, ___ U.S. ___, 131 S. Ct. 2567, 2577 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)), or if the local law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law," *Williamson v. Mazda Motor of Am., Inc.*, ___ U.S. ___, 131 S. Ct. 1131, 1136 (2011) (quoting *Hines v. Davidowitz*,

312 U.S. 52, 67 (1941)).[9] Because the FHAA permits the senior housing which the Ordinance requires, compliance with the Ordinance does not violate the FHAA. Likewise, the Ordinance does not interfere with the operation of the FHAA or the execution of its objectives because the FHAA allows for zoning laws like the Ordinance. Therefore, the FHAA neither expressly nor impliedly preempts the Ordinance.

## III.   CONCLUSION

**[9]** Because the FHAA, as amended by HOPA, is silent on the issue of whether municipally zoned senior housing can qualify for the senior exemption, we defer to HUD regulations allowing for such housing as a reasonable interpretation of the statute. We therefore AFFIRM the district court's judgment.

AFFIRMED.

---

[9]Federal law also impliedly preempts state or local law when " 'the scheme of federal regulation is so pervasive as to make reasonable the inference that there is no room for state action.' " *Aguayo*, 653 F.3d at 921 (quoting *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 157 (1978)). Putnam does not argue and therefore we do not consider such implied "field preemption" here.